IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

CANAL INSURANCE COMPANY,    )
    )
     *Plaintiff,*    )
    )
vs.    )    CIVIL ACTION NO. 2:07-cv-882-MHT
    )
BILLY GENE MICHAEL, *et al.,*    )
    )
     *Defendants.*    )

## MEMORANDUM BRIEF AND ARGUMENT
## IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

NOW COMES **CANDACE M. GROSE**, as personal representative of the Estate of JAKOB A. GROSE, deceased, and submits the following brief and argument in support of her motion for summary judgment:

## I. INTRODUCTION

Canal Insurance Company filed this declaratory judgment action seeking to avoid insurance coverage for damages arising out of a wrongful death suit pending in the Circuit Court of Montgomery County, Alabama. *(Canal Complaint)* Defendant Candace M. Grose herein is the personal representative and plaintiff in the subject wrongful death suit pending in Montgomery County, Alabama, which suit seeks damages for the wrongful death of her son, Jakob A. Grose, arising out of a collision occurring on April 7, 2005 in which Jakob received injuries from which he died. (<u>See</u> *Complaint* and *First Amended*

*Complaint* attached as Exhibits A and B to Canal's Complaint herein.) Canal acknowledges that Billy Gene Michael was operating a tractor trailer rig under the DOT authority of Defendant Joey Barnes d/b/a Bad J Trucking. (*Canal Complaint* at ¶11) Canal also acknowledges that the subject insurance policy ("suit policy") which was issued and delivered in Mississippi, at one time contained the tractor operated by Michael at the time of the fatal collision, as an insured vehicle. (*Canal Complaint* at ¶16) Canal acknowledges that the suit policy contained an MCS-90 endorsement.

Candace Grose says that the MCS-90 endorsement contained in the policy dictates that Canal is liable to Candace Grose in the event that Michael and/or Barnes are found to be legally liable for damages for the wrongful death of Jakob Grose and due to the MCS-90 endorsement, Canal must indemnify Barnes and/or Michael to the extent of its policy limit, after which, Canal may be entitled to recoup its payment from Barnes.

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In reviewing a motion for summary judgment, the court must view the evidence and all reasonable inferences drawn therefrom in the light most favorable to the non-moving party. *Swain v. Hillsborough County School Bd.*, 146 F.3d 855, 857 (11th Cir. 1998).

-2-

The party seeking summary judgment has the initial burden of showing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S.317, 324 (1986). **The moving party may discharge this burden by "pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case."** *Celotex Corp.*, 477 U.S. at 325 (*emphasis added*). Once the moving party meets that burden, the non-moving party must set forth **specific facts** demonstrating that there is a genuine issue of fact for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986) (*emphasis added*). A genuine issue of material fact exists for trial if a reasonable jury could return a verdict in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

To avoid an adverse ruling on a motion for summary judgment, the non-moving party "may not rest upon the mere allegations or denials of [their] pleadings." Fed.R.Civ.P. 56(e). Nor may the non-moving party defeat a summary judgment motion by simply providing a mere "scintilla" of evidence. *Burger King Corp. v. Weaver*, 169 F.2d 1310, 1321 (11th Cir. 1999). Instead, there must be a genuine factual conflict in the evidence to support a jury question. *Burton v. City of Belle Glade*, 178 F.3d 1175, 1187 (11th Cir. 1999).

## III. CANAL'S CONTENTIONS AND CITED EVIDENCE

Canal contends that neither Joey Barnes nor Billy Gene Michael are entitled to liability coverage under the suit policy because the policy had allegedly been removed

from the schedule of insured vehicles prior to the date of the fatal collision in which Jakob Grose was killed (April 7, 2005). (*Canal Complaint* at ¶16)

To support this contention, Canal alleges that the accident tractor operated by Michael was the subject of an endorsement removing the tractor and that any lease between Michael and Barnes had been terminated prior to the April 7, 2005 collision in which Jakob Grose was killed. (*Canal Complaint*, ¶¶16, 17(b)[1], and 18)

As set out in detail below, due to the MCS-90 endorsement, Canal is not permitted to avoid liability coverage even if its documents demonstrate that the suit tractor was deleted as an insured unit from the suit policy prior to the August 7, 2005 collision in which Jakob Grose was killed. Stated differently, Candace Grose points out that there is a complete absence of evidence from Canal that Canal is entitled to avoid coverage under these circumstances; hence, Candace Grose is entitled to summary judgment as a matter of law.

## IV. ARGUMENT

The MCS-90 endorsement which was attached to the suit policy and made a part thereof is required on any liability policy issued to motor carriers transporting property in interstate commerce. (See 49 C.F.R. §§ 387.3, 387.7) The primary purpose of the MCS-90 endorsement is to create a surety ship by the insurer to protect members of the public such

---

[1]Canal's Complaint contains two paragraphs numbered "17", therefore, for clarity, Candace Grose refers to paragraph 17 on page 6 as 17(a) and paragraph 17 on page 7 as 17(b).

as Jakob Grose and his personal representative, Candace Grose, when the insurance policy to which the MCS-90 endorsement is attached otherwise provides no coverage to the insured. (See *Canal Insurance Co. v. Distributors Services, Inc.*, 320 F.3d, 488, 490 (4th Cir. 2003) (citing *T.H.E. Insurance Company v. Larson Intermodal Services, Inc.*, 242 F.3d 667, 672 (5th Cir. 2001). The public policy underlying the MCS-90 endorsement is "to provide a safety net to members of the public injured as a result of negligent operation of tractor trailers used in interstate commerce." (See *Pierre v. Providence Washington Insurance Co.*, 99 NY.2d 222, 227, 784 NE.2d 52, 54 (2002).) "In effect, the endorsement shifts the risk of loss for accidents occurring in the course of interstate commerce away from the public by guaranteeing that an injured party will be compensated even if the insurance carrier has a valid defense based on a condition in the policy." *Providence Washington, supra*, at 53-54. The MCS-90 endorsement is read into the policy even if not physically attached to the policy and imputed by operation of law. *Hagans v. Glens Falls Insurance Co.*, 465 F.2d 1249, 1252 (10th Cir. 1972). The court in *Kaplan v. Harco National Insurance Co.*, 716 So.2d 673, 674-75 (Miss.App. 1998), explained the MCS-90 endorsement as follows:

> "The purpose of the MCS-90 endorsement is to protect the public against under capitalized and under insured common carriers. The endorsement provides that the insurer will pay any final judgment recovered against the insured from negligence in the operation of commercial motor vehicles. The insurer has to pay the injured party despite a limitational condition in the policy or endorsement stating otherwise. Additionally, the duty to pay is not contingent on the vehicle being specifically described in the policy."

The MCS-90 endorsement which, by operation of law, is contained in the Canal policy (suit policy) states as follows:

"The insurance policy to which this endorsement is attached provides automobile liability insurance is amended to assure compliance by the insured, within the limits stated herein, as a motor carrier of property, with sections 29 and 30 of the Motor Carrier Act of 1980 and the rules and regulations of the Federal Highway Administration's Bureau of Motor Carrier Safety (Bureau) and the Interstate Commerce Commission (ICC).

In consideration of the premium stated in the policy to which this endorsement is attached, the insurer (the company) agrees to pay, within the limits of liability described herein, any final judgment recovered against the insured for public liability resulting from negligence in the operation, maintenance or use of motor vehicles subject to the financial responsibility requirements of sections 29 and 30 of the Motor Carrier Act of 1980 regardless of whether or not each motor vehicle is specifically described in the policy and whether or not such negligence occurs on any route or in any territory authorized to be served by the insured or elsewhere. Such insurance as is afforded, for public liability, does not apply to injury to or death of the insured's employees while engaged in the course of their employment, or property transported by the insured, designated as cargo. It is understood and agreed that no condition, provision, stipulation, or limitation contained in the policy, this endorsement, or any other endorsement thereon, or violation thereof, shall relieve the company from liability or from the payment of any final judgment, with the limits of liability herein described, irrespective of the financial condition, insolvency or bankruptcy of the insured. However, all terms, conditions, and limitations in the policy to which the endorsement is attached shall remain in full force and effect as binding between the insured and the company. The insured agrees to reimburse the company for any payment made by the company on account of any accident, claim, or suit involving a breach of the terms of the policy, and for any payment that the company would not have been obligated to make under

the provisions of the policy except for the agreement contained in the endorsement. *(Emphasis added)*

It is further understood and agreed that, upon failure of the company to pay any final judgment recovered against the insured as provided herein, the judgment creditor may maintain an action in any court of competent jurisdiction against the company to compel such payment.

The limits of the company's liability for the amounts prescribed in this endorsement apply separately to each accident and any payment under the policy because of any one accident shall not operate to reduce the liability of the company for the payment of final judgments resulting from any other accident."

49 C.F.R. § 387.15.

The deposition of Karen Edge, the producing insurance agent for Canal, demonstrates that Michael's suit tractor was at one time listed as an insured unit on the suit policy declaration page and that the suit policy contained an MCS-90 endorsement. *(Dep. of Karen Edge* at p. 91, l. 8;  p. 94, l. 16–19;  p. 95, l. 21–96, l. ll;  p. 6;  p. 9, l. 19–23;  p. 10, l. 1–20;  p. 14, l. 19–23);  p. 15, l. 1–17;  p. 20, l. 12–23;  p. 21, l. 1–13)

The testimony of Billy Gene Michael demonstrates that he was an employee of Defendant Barnes and was operating under Barnes' DOT authority and, in fact, had a lease with Barnes at the time of the collision in which Jakob Grose was killed. *(Dep. of Billy Gene Michael* at p. 124, l. 4 – p. 133, l. 20)

## CONCLUSION

In this case, it is undisputed that Canal's attempt to avoid coverage falls squarely within the prohibition of the MCS-90 endorsement. Simply put, Canal may not avoid its liability and indemnity obligations to Joey Barnes and/or Billy Gene Michael by relying on a technical limitation such as removal of the suit tractor from the suit policy declaration. Indeed, Canal's behavior is precisely that which is prohibited by the MCS-90 endorsement. Accordingly, Candace Grose moves the Court to enter summary judgment declaring that Canal is obligated to indemnify Billy Gene Michael and/or Joey Barnes up to the $1,000,000 limit of the suit policy and, upon payment of such, that Canal may elect to be reimbursed for its payment from its insured as set out in the MCS-90 endorsement.

Respectfully submitted,

_/s/ David E. Allred_
DAVID E. ALLRED
D. CRAIG ALLRED
Attorneys for Above-Named Defendant

OF COUNSEL:
DAVID E. ALLRED, P.C.
Post Office Box 241594
Montgomery, Alabama 36124-1594
Telephone:    (334) 396-9200
Facsimile:    (334) 396-9977

JEMISON & MENDELSOHN, P.C.
1772 Platt Place
Montgomery, Alabama 36117
Telephone:    (334) 213-2323
Facsimile:    (334) 213-5663

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing *Memorandum Brief and Argument in Support of Motion for Summary Judgment* has been served upon the following counsel of record in this cause by *electronic transmission* on this the 8th day of February, 2008:

> Jack J. Hall, Esq.
> HALL, CONERLY & BOLVIG, P.C.
> 505 N. 20th Street
> Suite 1400
> Birmingham, Alabama   35203
>
> William Evans Brittain, Esq.
> BALL, BALL, MATTHEWS & NOVAK, P.A.
> Post Office Box 2148
> Montgomery, Alabama   36102-2148

I also certify that a copy has been served upon the following party in this cause by placing a copy thereof in the United States Mail, first-class postage prepaid, on this the 8th day of February, 2008:

> Joey Barnes, an individual
> and d/b/a Bad J Trucking
> Post Office Box 575
> Booneville, Mississippi   38829

>                    /s/ David E. Allred
>                    OF COUNSEL

cc:   James W. Garrett, Jr., Esq.
      Robert C. Ward, Jr., Esq.
      T. Kent Garrett, Esq.
      James M. Strong, Esq.
      K. Donald Simms, Esq.

COPY

1              IN THE CIRCUIT COURT

2                     FOR

3          MONTGOMERY COUNTY, ALABAMA

4

5     CANDACE M. GROSE

6

7     VS.

8

9     BILLY GENE MICHAEL, ET AL

10

11             CV-06-900085

12

13        *   *   *   *   *   *   *   *   *

14        IT IS STIPULATED AND AGREED, by and

15    between the parties through their

16    respective counsel, that the deposition of

17    KAREN EDGE may be taken before Robert E.

18    Rice, Commissioner, and Notary Public,

19    State at Large, at Booneville, Mississippi,

20    on December 6, 2007, beginning at

21    10:15 a.m.

22

23

8          Q.    Okay, are you familiar with a MCS90

9     endorsement?

16      Q.    All right.   No doubt in your mind

17    there was an MCS90 endorsement on this

18    policy.   Is that correct?

19      A.    That's correct.

21        Q.    All right.  Isn't that true that

22   that MCS90 endorsement means that the

23   carrier cannot avoid coverage on

1    circumstances just like what we have in

2    this matter here involving Jakob Grose's

3    death?

4        A.    I don't know if it would be in this

5    matter or not since the unit was added to

6    the policy and then it was deleted.  I know

7    that it can happen where they fail to add a

8    truck at all to the insurance policy.

9        Q.    And then the carrier cannot deny

10   liability based on this MCS90 endorsement?

11       A.    That's right.

1  KAREN EDGE, being duly sworn, was examined

2  and testified as follows:

3

4  EXAMINATION BY MR. STRONG:

5

6      Q.   Ms. Edge, my name is James Strong,

7  and I'm an attorney representing Billy

8  Michael in the lawsuit that was filed by

9  Mr. Allred by Ms. Candace Grose against my

10  client Billy Gene Michael and Mr. Garrett's

11  client Bad J Trucking.

12      A.   Okay.

13      Q.   Have you ever given a deposition

14  before?

15      A.   I have.

16      Q.   Okay, has it been awhile?

17      A.   It's been a long time.

18      Q.   I just have a few ground rules that

19  I'd like to go over.

20      A.   Okay.

21      Q.   Number one is, I just need you to

22  speak clearly.  If I ask you a yes or no

23  question, if you'll please answer yes or no

19      Q.    And who do you work for, Ms. Edge?

20      A.    Transportation Insurance Services,

21   Inc.

22      Q.    And how long have you worked for

23   them?

RICE COURT REPORTING (256) 332-4074

1       A.    I'm one of the owners and I have
2  worked there since 1995.
3       Q.    Who are the other owners of the
4  agency?
5       A.    Hilda McVey.
6       Q.    Was Ms. McVey -- did she already
7  own the agency?  Did you buy into it, or
8  did you guys start the agency?
9       A.    We started the agency together.
10       Q.    How do you spell Ms. McVey's last
11  name?
12       A.    M-C-V-E-Y.
13       Q.    So you started it in 1995?
14       A.    Yes.
15       Q.    You didn't purchase the agency from
16  anybody?
17       A.    No.
18       Q.    And am I correct that you do write
19  insurance for Canal Insurance Company?
20       A.    Yes.

19          Q.    Other Canal GA's, okay.  I'm going

20   to get right into it.  The policy we're

21   here about today was a policy issued to Bad

22   J Trucking.  Is that correct?

23          A.    That's correct, yes.

1       Q.    Do you have the policy number in
2   front of you?
3       A.    Yes.
4       Q.    Can you tell us what that is?
5       A.    The policy number is 395497.
6       Q.    And exactly what kind of policy was
7   issued to Bad J Trucking?
8       A.    This is an auto liability policy.
9       Q.    Is it a commercial policy?
10      A.    Yes.
11      Q.    Do you know when the date was that
12  this policy was issued to Bad J Trucking?
13      A.    The original policy, I believe, was
14  issued in 2003.
15      Q.    Do you have a month?
16      A.    It would have probably been March,
17  March the 28th.

12        Q.    Do you know when Mr. Michael's

13    vehicle was added to the Bad J Trucking

14    policy?

15        A.    November the 10th, 2004.

16        Q.    And do you have a copy -- well,

17    actually I have here what's called a Status

18    Summary Sheet, and I believe this shows

19    that his vehicle was added on 11/10/2004.

20    Is that correct?

21        A.    That is correct.

22        Q.    Okay, if you could please, could

23    you tell what kind of vehicle was added and

1    read the VIN number into the record please?

2

3            MR. ALLRED:   Is that Exhibit 2?

4            MR. STRONG:   Yes, that's going to

5    be Defendant's Exhibit 2, the Status

6    Summary Sheet from the Canal policy.

7

8            (WHEREUPON, Defendant's Exhibit 2

9            was marked for identification.)

10

11       A.    It's a 1993 International tractor,

12    VIN number 1MSRACAN3PH465116.

13       Q.    Okay.   When Mr. Michael's

# DEPOSITION OF BILLY GENE MICHAEL

## March 20, 2007

## Pages 1 through 227

**Haislip, Ragan, Green, Starkie & Watson, P.C.**
**566 South Perry Street**
**Post Office Box 62**
**Montgomery, AL  36104**
**Phone: (334) 263-4455**
**Fax: (334) 263-9167**
**E-mail: haislipragan@charter.net**

4   Q.  Okay.  So at the time of the wreck, you

5       were employed by Bad J?

6   A.  Yes, sir.

7   Q.  Joey Barnes.

8   A.  Yes, sir.

9   Q.  Like on your income tax return when it said

10      employer, did you put down Bad J Trucking

11      Company?

12   A.  Yes, that would have been where my W-2 came

13      from.

14   Q.  Did you have any other employer other than

15      Joey Barnes, Bad J Trucking Company?

16   A.  Yes, sir.

17   Q.  Who was that?

18   A.  I also drove for M & L that year.

19   Q.  At the time of the wreck?

20   A.  No, after.

21   Q.  I'm talking about the day of the wreck,

22      now.  Let's talk about that a minute.

23   A.  Oh, the day of the wreck, I was strictly

31 (Pages 121 to 124)

Page 125

1    hauling -- it was strictly Bad J.
2    Q.  And when this wreck happened, were you
3         acting in the line and scope of your duties
4         as a driver for your employer?
5              MR. WARD:  Form.  Go ahead.
6    A.  Yes, sir.
7              MR. WARD:  You can answer.
8    Q.  What did you say?
9    A.  Yes, sir.
10             MR. WARD:  He said yes, sir.
11   Q.  Okay.  Now, how long had you worked for
12        Bad J?
13   A.  I started I believe it was in December of
14        '04.
15   Q.  All right.  Who did you talk to about going
16        to work for Bad J?
17   A.  His cousin, Benny Cooksey, told me about
18        him and told me --
19   Q.  Benny?
20   A.  Benny, B-E-N-N-Y.
21   Q.  All right.  I can handle that.  What's that
22        last name?
23   A.  Cooksey.

Page 126

1    Q.  All right.  Benny.  C-O --
2    A.  O-K-S-E-Y, I believe.
3    Q.  And that is Joey Barnes' cousin.
4    A.  Uh-huh (positive response).  Yes, sir.
5    Q.  So who actually hired you into the Bad J
6         organization?
7              MR. WARD:  Form.
8    A.  Joey.
9    Q.  Joey Barnes?
10   A.  Yes, sir.
11   Q.  How long had you known him when you went to
12        work?
13   A.  I really didn't know him, just --
14   Q.  Did you know him before he hired you?
15   A.  No, sir.
16   Q.  All right.  Why did you go to work for him?
17   A.  Just through his cousin.  I was -- I was
18        wanting to lease -- was hunting another
19        place to lease, and he told me about Joey.
20        And so Joey came to me, and we seemed to
21        hit it off.
22   Q.  What was your arrangement with Joey Barnes?
23   A.  As a what?

Page 127

1    Q.  For you to be working for him.
2    A.  Well, I just -- I just leased to him.
3    Q.  You did what, now?
4    A.  I leased -- I leased to him.
5    Q.  What percentage did you get out of the
6         gross?
7    A.  He charged me so much a week to run his
8         authority.
9    Q.  What did he charge you?
10   A.  He charged me a hundred dollars a week.
11   Q.  What did he do for the $100 a week?
12   A.  He didn't do nothing for it except provide
13        a name on my door and make sure -- he was
14        supposed to make sure that the insurance
15        and everything was --
16   Q.  Okay.
17   A.  -- kept up.
18   Q.  Did you have any type of -- anything in
19        writing about the -- you were talking about
20        being leased to him?
21   A.  He never did draw up a lease agreement.  It
22        was just --
23   Q.  Is there anything in those documents y'all

Page 128

1    produced about your deal with Joey Barnes?
2    A.  Don't think so.
3    Q.  All right.  The name on the door, there's
4         some pictures I had here while ago.
5              MR. ALLRED:  Find us one with the
6         name on the door.
7    Q.  Did you have -- What was that, a magnetic
8         sign or something?
9    A.  No, sir.
10   Q.  Was it actually painted on there?
11   A.  It was -- What do they call it.
12   Q.  This right here.
13   A.  Vinyl.  It was vinyl tape.
14   Q.  Vinyl tape?
15   A.  Uh-huh (positive response).  Yes, sir.
16   Q.  And so the reason you had that on your door
17        was what?
18   A.  Because he was the man I was running
19        under.  I had to --
20   Q.  Who is actually Bad J?  Who is that person?
21   A.  That's Joey Barnes.
22   Q.  He's Bad J?
23   A.  Yes, sir.

Deposition of Billy Gene Michael                                                March 20, 2007

---

Page 129

1   Q. And you say running under. So Joey Barnes
2      had a -- he had a DOT permit?
3   A. Yes, sir.
4   Q. Did you have one?
5   A. No, sir, I was running under his.
6   Q. And when you say running under his, he was
7      charging you a hundred dollars a week to
8      run under his -- to use his DOT number; is
9      that right?
10  A. Yes, sir.
11  Q. And then who furnished the loads?
12  A. We got the loads -- He had the loads set up
13     through that FSR.
14  Q. All right. So Joey Barnes furnished you
15     with this load when the accident happened?
16  A. Yes, sir.
17  Q. And how did that work? How did you know
18     you had a load?
19  A. I would talk to the man at FSR. He knew
20     the agreement that me and Joey had, and he
21     was furnishing both of us hauling.
22  Q. Did Joey Barnes also have trucks and he
23     hauled loads?

---

Page 130

1   A. Yes, sir.
2   Q. How many trucks did he have?
3   A. I really don't -- I really don't know. I
4     can't say.
5   Q. Give me your best judgment. One or ten or
6     five?
7        MR. WARD: Form.
8   A. I knew he had one he was driving, and there
9     was another boy leased to him, I believe,
10    at the time.
11  Q. When you met with Joey Barnes and he hired
12     you, where did that meeting take place?
13  A. At my house.
14  Q. He came to your house.
15  A. Yes, sir.
16  Q. All right. When I asked you while ago did
17     you know how to find Joey Barnes and you
18     kind of laughed, is he still around over
19     there in --
20      What's the name of that town on that
21     door?
22  A. That's Iuka.
23  Q. Is he still around in Iuka?

---

Page 131

1   A. I can't say what town he's living in, but I
2     know he's still around.
3   Q. You didn't know much about him, then, when
4     you went to work for him, did you?
5   A. Not really, no, sir.
6   Q. All right. And you're telling me you don't
7     have a clue how to find him today.
8        MR. WARD: Form.
9   A. No, sir, not really.
10  Q. Now, what was he supposed to furnish? He
11     was going to furnish the loads, and he
12     furnished you a DOT number; is that right?
13  A. His authorities.
14  Q. Okay. What did that mean to you?
15  A. It means everything that went on my truck
16     had to go through Joey Barnes.
17  Q. Did you -- What kind of arrangement did you
18     have with Joey Barnes about the insurance?
19  A. The insurance is in his name.
20  Q. How do you know that?
21  A. Because the name that appears on a truck
22     door, that's the name the insurance has to
23     be in.

---

Page 132

1   Q. Did you pay anything for the insurance?
2   A. Yes, sir.
3   Q. How much did you pay?
4   A. It's 600 a month.
5   Q. Who did you pay that to?
6   A. To the insurance company.
7   Q. And who was the insurance company?
8   A. Transportation Insurance.
9   Q. Okay. Are they in Booneville?
10  A. Yes, sir.
11  Q. All right. And this tractor was a '93
12     International; is that right?
13  A. Yes, sir.
14  Q. Have you ever been told that you do not
15     have liability insurance? Anybody told you
16     you do not have liability insurance?
17        MR. WARD: Form.
18  A. No, sir.
19  Q. Do you, as far as you know, have liability
20     insurance?
21  A. Yes, sir.
22  Q. Who is it with?
23  A. It was with Canal.

---

33 (Pages 129 to 132)

Deposition of Billy Gene Michael

Page 133

```
 1    Q.  All right.  And that's through the agent
 2         Transportation Insurance Services in
 3         Booneville, Mississippi?
 4    A.  Yes.
 5    Q.  And when you would make your payments to
 6         them, how would you make them?
 7    A.  Cash.
 8    Q.  Who did you make them to?  Any particular
 9         person in there?
10    A.  Most of the time it would be to Karen Edge.
11    Q.  Karen Edge?
12    A.  Yes, sir.
13    Q.  All right.  Would they give you a receipt?
14    A.  Yes, sir.
15    Q.  Is it true that there's not any dispute
16         between you and Canal Insurance Company
17         about whether you have liability coverage
18         that covers you for this wreck?
19             MR. WARD:  Form.
20    A.  I've not heard nothing from Canal.
```