## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

CANAL INSURANCE COMPANY,    ]
            ]
    Plaintiff,           ]
            ]
v.            ]    CASE NO. 2:07 CV 882 MHT
            ]
BILLY GENE MICHAELS,    ]
an individual; JOEY BARNES,    ]
individually and d/b/a    ]
BAD J TRUCKING COMPANY;    ]
CANDACE M. GROSE, as personal    ]
representative of the Estate of    ]
JAKOB A. GROSE, et al.,    ]
            ]
    Defendants    ]

### BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

COMES NOW the Defendant, BILLY GENE MICHAELS, and hereby submits this Brief in support of Motion for Summary Judgment, and submits the following:

1.    Defendant adopts and incorporates by reference the Memorandum Brief and Argument in Support of Motion for Summary Judgment filed by Defendant Candace M. Grose. This Defendant is entitled to judgment as a matter of law for the identical reasons set forth in the Memorandum Brief filed by Defendant Grose.

2.    Defendant adopts and incorporates by reference all the evidentiary submissions submitted by Candace M. Grose in support of her Motion for Summary Judgment. Specifically, Defendant relies upon the deposition excerpts of Billy Gene Michael and Karen Edge.

WHEREFORE, premises considered, Defendant respectfully requests this Court enter an order granting his Motion for Summary Judgment and entering judgment in his

favor and against Plaintiff Canal Insurance Company, as there are no genuine issues of

material fact and this Defendant is entitled to judgment as a matter of law.

Respectfully submitted,

/s/ W. Evans Brittain
W. Evans Brittain
Attorney for Billy Michael

OF COUNSEL:
Ball, Ball, Matthews & Novak, P.A.
2000 Interstate Park Drive
Suite #204 [36109-5413]
P.O. Box 2148
Montgomery, Alabama  36102-2148
Telephone (334) 387-7680
Telefax (334) 387-3222
ebrittain@ball-ball.com

## CERTIFICATE OF SERVICE

I hereby certify that on this February 11, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

David Craig Allred
callred@allredpclaw.com,bflowers@allredpclaw.com

David Earl Allred
dallred@allredpclaw.com,bflowers@allredpclaw.com

Jack Jordan Hall , Sr.
jack.hall@hallconerly.com,joice.frame@hallconerly.com

Manual Service

Joey Barnes
45 County Road 229
Iuka, MS 38852

C. Peter Bolvig, Esq.
Hall, Conerly, Mudd & Bolvig, P.C.
Suite 1400 - 505 N. 20th Street
Birmingham, AL  35203-2626

/s/ W. Evans Brittain
OF COUNSEL

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

CANAL INSURANCE COMPANY,           )
                                    )
        *Plaintiff,*                )
                                    )
vs.              Case 2:07-cv-00882-MHT-SRW  CIVIL ACTION NO. 2:07-cv-882-MHT
                                    )
BILLY GENE MICHAEL, *et al.,*       )
                                    )
        *Defendants.*               )

## MEMORANDUM BRIEF AND ARGUMENT
## IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

NOW COMES CANDACE M. GROSE, as personal representative of the Estate of JAKOB

A. GROSE, deceased, and submits the following brief and argument in support of her

motion for summary judgment:

## I. INTRODUCTION

Canal Insurance Company filed this declaratory judgment action seeking to avoid

insurance coverage for damages arising out of a wrongful death suit pending in the Circuit

Court of Montgomery County, Alabama. *(Canal Complaint)* Defendant Candace M. Grose

herein is the personal representative and plaintiff in the subject wrongful death suit

pending in Montgomery County, Alabama, which suit seeks damages for the wrongful

death of her son, Jakob A. Grose, arising out of a collision occurring on April 7, 2005 in

which Jakob received injuries from which he died. (See *Complaint* and *First Amended*



*Complaint* attached as Exhibits A and B to Canal's Complaint herein.) Canal acknowledges that Billy Gene Michael was operating a tractor trailer rig under the DOT authority of Defendant Joey Barnes d/b/a Bad J Trucking.  (*Canal Complaint* at ¶11) Canal also acknowledges that the subject insurance policy ("suit policy") which was issued and delivered in Mississippi, at one time contained the tractor operated by Michael at the time of the fatal collision, as an insured vehicle. (*Canal Complaint* at ¶16)  Canal acknowledges that the suit policy contained an MCS-90 endorsement.

Case 2:07-cv-00882-MHT-SRW    Document 21    Filed 02/08/2008    Page 2 of

Candace Grose says that the MCS-90 endorsement contained in the policy dictates that Canal is liable to Candace Grose in the event that Michael and/or Barnes are found to be legally liable for damages for the wrongful death of Jakob Grose and due to the MCS-90 endorsement, Canal must indemnify Barnes and/or Michael to the extent of its policy limit, after which, Canal may be entitled to recoup its payment from Barnes.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).  In reviewing a motion for summary judgment, the court must view the evidence and all reasonable inferences drawn therefrom in the light most favorable to the non-moving party. *Swain v. Hillsborough County School Bd.*, 146 F.3d 855, 857 (11th Cir. 1998).

The party seeking summary judgment has the initial burden of showing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). **The moving party may discharge this burden by "pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case."** *Celotex Corp.*, 477 U.S. at 325 (*emphasis added*). Once the moving party meets that burden, the non-moving party must set forth **specific facts** demonstrating that there is a genuine issue of fact for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986) (*emphasis added*). A genuine issue of material fact exists for trial if a reasonable jury could return a verdict in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Case 2:07-cv-00882-MHT-SRW   Document 21   Filed 02/08/2008   Page 3 of

To avoid an adverse ruling on a motion for summary judgment, the non-moving party "may not rest upon the mere allegations or denials of [their] pleadings." Fed.R.Civ.P. 56(e). Nor may the non-moving party defeat a summary judgment motion by simply providing a mere "scintilla" of evidence. *Burger King Corp. v. Weaver*, 169 F.2d 1310, 1321 (11ᵗʰ Cir. 1999). Instead, there must be a genuine factual conflict in the evidence to support a jury question. *Burton v. City of Belle Glade*, 178 F.3d 1175, 1187 (11ᵗʰ Cir. 1999).

## III.  CANAL'S CONTENTIONS AND CITED EVIDENCE

Canal contends that neither Joey Barnes nor Billy Gene Michael are entitled to liability coverage under the suit policy because the policy had allegedly been removed

from the schedule of insured vehicles prior to the date of the fatal collision in which Jakob Grose was killed (April 7, 2005). (*Canal Complaint* at ¶16)

To support this contention, Canal alleges that the accident tractor operated by Michael was the subject of an endorsement removing the tractor and that any lease between Michael and Barnes had been terminated prior to the April 7, 2005 collision in which Jakob Grose was killed. (*Canal Complaint*, ¶¶16, 17(b)[1], and 18)

As set out in detail below, due to the MCS-90 endorsement, Canal is not permitted to avoid liability coverage even if its documents demonstrate that the suit tractor was deleted as an insured unit from the suit policy prior to the August 7, 2005 collision in which Jakob Grose was killed. Stated differently, Candace Grose points out that there is a complete absence of evidence from Canal that Canal is entitled to avoid coverage under these circumstances; hence, Candace Grose is entitled to summary judgment as a matter of law.

## IV. ARGUMENT

The MCS-90 endorsement which was attached to the suit policy and made a part thereof is required on any liability policy issued to motor carriers transporting property in interstate commerce. (See 49 C.F.R. §§ 387.3, 387.7) The primary purpose of the MCS-90 endorsement is to create a surety ship by the insurer to protect members of the public such

---

[1]Canal's Complaint contains two paragraphs numbered "17", therefore, for clarity, Candace Grose refers to paragraph 17 on page 6 as 17(a) and paragraph 17 on page 7 as 17(b).

as Jakob Grose and his personal representative, Candace Grose, when the insurance policy

to which the MCS-90 endorsement is attached otherwise provides no coverage to the

insured. (See *Canal Insurance Co. v. Distributors Services, Inc.*, 320 F.3d, 488, 490 (4th Cir.

2003) (citing *T.H.E. Insurance Company v. Larson Intermodal Services, Inc.*, 242 F.3d 667, 672

(5th Cir. 2001). The public policy underlying the MCS-90 endorsement is "to provide a

Case 2:07-cv-00882-MHT-SRW    Document 21    Filed 02/08/2008    Page 5 of

safety net to members of the public injured as a result of negligent operation of tractor

trailers used in interstate commerce." (See *Pierre v. Providence Washington Insurance Co.*, 99

NY.2d 222, 227, 784 NE.2d 52, 54 (2002).) "In effect, the endorsement shifts the risk of loss

for accidents occurring in the course of interstate commerce away from the public by

guaranteeing that an injured party will be compensated even if the insurance carrier has

a valid defense based on a condition in the policy." *Providence Washington, supra*, at 53-54.

The MCS-90 endorsement is read into the policy even if not physically attached to the

policy and imputed by operation of law. *Hagans v. Glens Falls Insurance Co.*, 465 F.2d 1249,

1252 (10th Cir. 1972). The court in *Kaplan v. Harco National Insurance Co.*, 716 So.2d 673, 674-

75 (Miss.App. 1998), explained the MCS-90 endorsement as follows:

> "The purpose of the MCS-90 endorsement is to protect the
> public against under capitalized and under insured common
> carriers. The endorsement provides that the insurer will pay
> any final judgment recovered against the insured from
> negligence in the operation of commercial motor vehicles. The
> insurer has to pay the injured party despite a limitational
> condition in the policy or endorsement stating otherwise.
> Additionally, the duty to pay is not contingent on the vehicle
> being specifically described in the policy."

The MCS-90 endorsement which, by operation of law, is contained in the Canal

policy (suit policy) states as follows:

> "The insurance policy to which this endorsement is attached
> provides automobile liability insurance is amended to assure
> compliance by the insured, within the limits stated herein, as
> a motor carrier of property, with sections 29 and 30 of the
> Motor Carrier Act of 1980 and the rules and regulations of the
> Federal Highway Administration's Bureau of Motor Carrier
> Safety (Bureau) and the Interstate Commerce Commission
> (ICC).

Case 2:07-cv-00882-MHT-SRW    Document 21    Filed 02/08/2008    Page 6 of

> In consideration of the premium stated in the policy to which
> this endorsement is attached, the insurer (the company) agrees
> to pay, within the limits of liability described herein, any final
> judgment recovered against the insured for public liability
> resulting from negligence in the operation, maintenance or use
> of motor vehicles subject to the financial responsibility
> requirements of sections 29 and 30 of the Motor Carrier Act of
> 1980 regardless of whether or not each motor vehicle is
> specifically described in the policy and whether or not such
> negligence occurs on any route or in any territory authorized
> to be served by the insured or elsewhere. Such insurance as is
> afforded, for public liability, does not apply to injury to or
> death of the insured's employees while engaged in the course
> of their employment, or property transported by the insured,
> designated as cargo.  It is understood and agreed that no
> condition, provision, stipulation, or limitation contained in the
> policy, this endorsement, or any other endorsement thereon,
> or violation thereof, shall relieve the company from liability or
> from the payment of any final judgment, with the limits of
> liability herein described, irrespective of the financial
> condition, insolvency or bankruptcy of the insured. However,
> all terms, conditions, and limitations in the policy to which the
> endorsement is attached shall remain in full force and effect as
> binding between the insured and the company. The insured
> agrees to reimburse the company for any payment made by the
> company on account of any accident, claim, or suit involving
> a breach of the terms of the policy, and for any payment that
> the company would not have been obligated to make under

the provisions of the policy except for the agreement contained
in the endorsement. *(Emphasis added)*

It is further understood and agreed that, upon failure of the
company to pay any final judgment recovered against the
insured as provided herein, the judgment creditor may
maintain an action in any court of competent jurisdiction
against the company to compel such payment.

Case 2:07-cv-00882-MHT-SRW    Document 21    Filed 02/08/2008    Page 7 of

The limits of the company's liability for the amounts
prescribed in this endorsement apply separately to each
accident and any payment under the policy because of any one
accident shall not operate to reduce the liability of the
company for the payment of final judgments resulting from
any other accident."

49 C.F.R. § 387.15.

The deposition of Karen Edge, the producing insurance agent for Canal,

demonstrates that Michael's suit tractor was at one time listed as an insured unit on the suit

policy declaration page and that the suit policy contained an MCS-90 endorsement. *(Dep.*

*of Karen Edge* at p. 91, l. 8;  p. 94, l. 16–19;  p. 95, l. 21–96, l. II;  p. 6;  p. 9, l. 19–23;  p. 10, l.

1–20;  p. 14, l. 19–23);  p. 15, l. 1–17;  p. 20, l. 12–23;  p. 21, l. 1–13)

The testimony of Billy Gene Michael demonstrates that he was an employee of

Defendant Barnes and was operating under Barnes' DOT authority and, in fact, had a lease

with Barnes at the time of the collision in which Jakob Grose was killed.  *(Dep. of Billy Gene*

*Michael* at p. 124, l. 4 – p. 133, l. 20)

<u>CONCLUSION</u>

In this case, it is undisputed that Canal's attempt to avoid coverage falls squarely

within the prohibition of the MCS-90 endorsement. Simply put, Canal may not avoid its

liability and indemnity obligations to Joey Barnes and/or Billy Gene Michael by relying

on a technical limitation of its obligations within the suit policy's coverage section.

Indeed, Canal's behavior is precisely that which is prohibited by the MCS-90 endorsement.

Accordingly, Candace Grose moves the Court to enter summary judgment declaring that

Canal is obligated to indemnify Billy Gene Michael and/or Joey Barnes up to the $1,000,000

limit of the suit policy and, upon payment of such, that Canal may elect to be reimbursed

for its payment from its insured as set out in the MCS-90 endorsement.

Respectfully submitted,


__/s/ David E. Allred_____
DAVID E. ALLRED
D. CRAIG ALLRED
Attorneys for Above-Named Defendant


OF COUNSEL:
DAVID E. ALLRED, P.C.
Post Office Box 241594
Montgomery, Alabama 36124-1594
Telephone:   (334) 396-9200
Facsimile:    (334) 396-9977

JEMISON & MENDELSOHN, P.C.
1772 Platt Place
Montgomery, Alabama 36117
Telephone:   (334) 213-2323
Facsimile:    (334) 213-5663

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing *Memorandum Brief and Argument in Support of Motion for Summary Judgment* has been served upon the following counsel of record in this cause by *electronic transmission* on this the 8th day of February, 2008:

> Jack Case 2:07sqv-00882-MHT-SRW     Document 21     Filed 02/08/2008     Page 9 of
> HALL, CONERLY & BOLVIG, P.C.
> 505 N. 20th Street
> Suite 1400
> Birmingham, Alabama  35203
>
> William Evans Brittain, Esq.
> BALL, BALL, MATTHEWS & NOVAK, P.A.
> Post Office Box 2148
> Montgomery, Alabama  36102-2148

I also certify that a copy has been served upon the following party in this cause by placing a copy thereof in the United States Mail, first-class postage prepaid, on this the 8th day of February, 2008:

> Joey Barnes, an individual
> and d/b/a Bad J Trucking
> Post Office Box 575
> Booneville, Mississippi  38829

> /s/ David E. Allred
> OF COUNSEL

cc:     James W. Garrett, Jr., Esq.
        Robert C. Ward, Jr., Esq.
        T. Kent Garrett, Esq.
        James M. Strong, Esq.
        K. Donald Simms, Esq.

COPY

1

IN THE CIRCUIT COURT

FOR

MONTGOMERY COUNTY, ALABAMA

CAUSE 2:07-cv-00882-MHT

VS.

BILLY GENE MICHAEL, ET AL

CV-06-900085

*   *   *   *   *   *   *   *   *

IT IS STIPULATED AND AGREED, by and
between the parties through their
respective counsel, that the deposition of
KAREN EDGE may be taken before Robert E.
Rice, Commissioner, and Notary Public,
State at Large, at Booneville, Mississippi,
on December 6, 2007, beginning at
10:15 a.m.

EXHIBIT

2

RICE COURT REPORTING (256) 332-4074

8       Q.   Okay, are you familiar with a MCS90

9    endorsement?

16      Q.    All right.   No doubt in your mind

17    there was an MCS90 endorsement on this

18    policy.   Is that correct?

19      A.    That's correct.

21          Q.    All right.   Isn't that true that

22    that MCS90 endorsement means that the

23    carrier cannot avoid coverage on

1  circumstances just like what we have in

2  this matter here involving Jakob Grose's

3  death?

4      A.    I don't know if it would be in this

5  Case 2:07-cv-00882-MHT-SRW    Document 21-2    Filed 02/08/2008    Page 5 of matter or whether

6  the policy and then it was deleted.  I know

7  that it can happen where they fail to add a

8  truck at all to the insurance policy.

9      Q.    And then the carrier cannot deny

10  liability based on this MCS90 endorsement?

11      A.    That's right.

6

1    KAREN EDGE, being duly sworn, was examined

2    and testified as follows:

3

4    EXAMINATION BY MR. STRONG:

5    Case 2:07-cv-00882-MHT-SRW    Document 21-2    Filed 02/08/2008    Page 6 of

6    Q.    Ms. Edge, my name is James Strong,

7    and I'm an attorney representing Billy

8    Michael in the lawsuit that was filed by

9    Mr. Allred by Ms. Candace Grose against my

10   client Billy Gene Michael and Mr. Garrett's

11   client Bad J Trucking.

12   A.    Okay.

13   Q.    Have you ever given a deposition

14   before?

15   A.    I have.

16   Q.    Okay, has it been awhile?

17   A.    It's been a long time.

18   Q.    I just have a few ground rules that

19   I'd like to go over.

20   A.    Okay.

21   Q.    Number one is, I just need you to

22   speak clearly.  If I ask you a yes or no

23   question, if you'll please answer yes or no

| | |
|---|---|
| 19 | Q.    And who do you work for, Ms. Edge: |
| 20 | A.    Transportation Insurance Services, |
| 21 | Inc. |
| 22 | Q.    And how long have you worked for |
| 23 | them? |

1     A.    I'm one of the owners and I have

2  worked there since 1995.

3     Q.    Who are the other owners of the

4  agency?

Case 2:07-cv-00882-MHT-SRW    Document 21-2    Filed 02/08/2008    Page 8 of

5     A.    Hildee McVey.

6     Q.    Was Ms. McVey -- did she already

7  own the agency?  Did you buy into it, or

8  did you guys start the agency?

9     A.    We started the agency together.

10     Q.    How do you spell Ms. McVey's last

11  name?

12     A.    M-C-V-E-Y.

13     Q.    So you started it in 1995?

14     A.    Yes.

15     Q.    You didn't purchase the agency from

16  anybody?

17     A.    No.

18     Q.    And am I correct that you do write

19  insurance for Canal Insurance Company?

20     A.    Yes.

19     Q.     Other Canal GA's, okay.  I'm going

20   to get right into it.  The policy we're

21   here about today was a policy issued to Bad

22   J Trucking.  Is that correct?

23     A.     That's correct, yes.

1     Q.    Do you have the policy number in

2    front of you?

3     A.    Yes.

4     Q.    Can you tell us what that is?

5     A.    The policy number Case 2:07-cv-00882-MHT-SRW    Document 23-4    Filed 02/08/2008    Page 10 o

6     Q.    And exactly what kind of policy was

7    issued to Bad J Trucking?

8     A.    This is an auto liability policy.

9     Q.    Is it a commercial policy?

10    A.    Yes.

11    Q.    Do you know when the date was that

12   this policy was issued to Bad J Trucking?

13    A.    The original policy, I believe, was

14   issued in 2003.

15    Q.    Do you have a month?

16    A.    It would have probably been March,

17   March the 28th.

12      Q.   Do you know when Mr. Michael's

13  vehicle was added to the Bad J Trucking

14  policy?

15      A.   November the 10th, 2004.

16      Q.   And do you have a copy -- well,

17  actually I have here what's called a Status

18  Summary Sheet, and I believe this shows

19  that his vehicle was added on 11/10/2004.

20  Is that correct?

21      A.   That is correct.

22      Q.   Okay, if you could please, could

23  you tell what kind of vehicle was added and

RICE COURT REPORTING (256) 332-4074

1    read the VIN number into the record please?

2

3         MR. ALLRED:   Is that Exhibit 2?

4         MR. STRONG:   Yes, that's going to

5    be Case 2:07-cv-00882-MHT-SRW    Document 21-2    Filed 02/08/2008    Page 12 of

6    Summary Sheet from the Canal policy.

7

8         (WHEREUPON, Defendant's Exhibit 2

9         was marked for identification.)

10

11    A.    It's a 1993 International tractor,

12    VIN number 1MSRACAN3PH465116.

13    Q.    Okay.   When Mr. Michael's

# DEPOSITION OF BILLY GENE MICHAEL

## March 20, 2007

## Pages 1 through 227

**Haislip, Ragan, Green, Starkie & Watson, P.C.**
**566 South Perry Street**
**Post Office Box 62**
**Montgomery, AL 36104**
**Phone: (334) 263-4455**
**Fax: (334) 263-9167**
**E-mail: haislipragan@charter.net**

EXHIBIT

3

```
 4    Q.  Okay.  So at the time of the wreck, you
 5         were employed by Bad J?
 6    A.  Yes, sir.
 7    Q.  Joey Barnes.
 8    A.  Yes, sir.
 9    Q.  Like on your income tax return when it said
10         employer, did you put down Bad J Trucking
11         Company?
12    A.  Yes, that would have been where my W-2 came
13         from.
14    Q.  Did you have any other employer other than
15         Joey Barnes, Bad J Trucking Company?
16    A.  Yes, sir.
17    Q.  Who was that?
18    A.  I also drove for M & L that year.
19    Q.  At the time of the wreck?
20    A.  No, after.
21    Q.  I'm talking about the day of the wreck,
22         now.  Let's talk about that a minute.
23    A.  Oh, the day of the wreck, I was strictly
```

31 (Pages 121 to 124)

| Page 125 | Page 127 |
|---|---|

Page 125

1   hauling -- it was strictly Bad J.
2   Q.   And when this wreck happened, were you
3        acting in the line and scope of your duties
4        as a driver for your employer?
5        MR. WARD: Form. Go ahead.
6   A.   Yes, sir.
7        MR. WARD: You can answer.
8   Q.   What did you say?
9   A.   Yes, sir.
10       MR. WARD: He said yes, sir.
11  Q.   Okay. Now, how long had you worked for
12       Bad J?
13  A.   I started I believe it was in December of
14       '04.
15  Q.   All right. Who did you talk to about going
16       to work for Bad J?
17  A.   His cousin, Benny Cooksey, told me about
18       him and told me --
19  Q.   Benny?
20  A.   Benny, B-E-N-N-Y.
21  Q.   All right. I can handle that. What's that
22       last name?
23  A.   Cooksey.

Page 127

1   Q.   For you to be working for him.
2   A.   Well, I just -- I just leased to him.
3   Q.   You did what, now?
4   A.   I leased -- I leased to him.
5   Q.   What percentage did you get out of the
6        gross?
7   A.   He charged me so much a week to run his
8        authority.
9   Q.   What did he charge you?
10  A.   He charged me a hundred dollars a week.
11  Q.   What did he do for the $100 a week?
12  A.   He didn't do nothing for it except provide
13       a name on my door and make sure -- he was
14       supposed to make sure that the insurance
15       and everything was --
16  Q.   Okay.
17  A.   -- kept up.
18  Q.   Did you have any type of -- anything in
19       writing about the -- you were talking about
20       being leased to him?
21  A.   He never did draw up a lease agreement. It
22       was just --
23  Q.   Is there anything in those documents y'all

Page 126

1   Q.   All right. Benny. C-O --
2   A.   O-K-S-E-Y, I believe.
3   Q.   And that is Joey Barnes' cousin.
4   A.   Uh-huh (positive response). Yes, sir.
5   Q.   So who actually hired you into the Bad J
6        organization?
7        MR. WARD: Form.
8   A.   Joey.
9   Q.   Joey Barnes?
10  A.   Yes, sir.
11  Q.   How long had you known him when you went to
12       work?
13  A.   I really didn't know him, just --
14  Q.   Did you know him before he hired you?
15  A.   No, sir.
16  Q.   All right. Why did you go to work for him?
17  A.   Just through his cousin. I was -- I was
18       wanting to lease -- was hunting another
19       place to lease, and he told me about Joey.
20       And so Joey came to me, and we seemed to
21       hit it off.
22  Q.   What was your arrangement with Joey Barnes?
23  A.   As a what?

Page 128

1   produced about your deal with Joey Barnes?
2   A.   Don't think so.
3   Q.   All right. The name on the door, there's
4        some pictures I had here while ago.
5        MR. ALLRED: Find us one with the
6        name on the door.
7   Q.   Did you have -- What was that, a magnetic
8        sign or something?
9   A.   No, sir.
10  Q.   Was it actually painted on there?
11  A.   It was -- What do they call it.
12  Q.   This right here.
13  A.   Vinyl. It was vinyl tape.
14  Q.   Vinyl tape?
15  A.   Uh-huh (positive response). Yes, sir.
16  Q.   And so the reason you had that on your door
17       was what?
18  A.   Because he was the man I was running
19       under. I had to --
20  Q.   Who is actually Bad J? Who is that person?
21  A.   That's Joey Barnes.
22  Q.   He's Bad J?
23  A.   Yes, sir.

32 (Pages 125 to 128)

Page 129

1  Q. And you say running under. So Joey Barnes
2     had a -- he had a DOT permit?
3  A. Yes, sir.
4  Q. Did you have one?
5  A. No, sir, I was running under his.
6  Q. And when you say running under his, he was
7     charging you a hundred dollars a week to
8     run under his -- to use his DOT number; is
9     that right?
10 A. Yes, sir.
11 Q. And then who furnished the loads?
12 A. We got the loads -- He had the loads set up
13    through that FSR.
14 Q. All right. So Joey Barnes furnished you
15    with this load when the accident happened?
16 A. Yes, sir.
17 Q. And how did that work? How did you know
18    you had a load?
19 A. I would talk to the man at FSR. He knew
20    the agreement that me and Joey had, and he
21    was furnishing both of us hauling.
22 Q. Did Joey Barnes also have trucks and he
23    hauled loads?

Page 130

1  A. Yes, sir.
2  Q. How many trucks did he have?
3  A. I really don't -- I really don't know. I
4     can't say.
5  Q. Give me your best judgment. One or ten or
6     five?
7        MR. WARD: Form.
8  A. I knew he had one he was driving, and there
9     was another boy leased to him, I believe,
10    at the time.
11 Q. When you met with Joey Barnes and he hired
12    you, where did that meeting take place?
13 A. At my house.
14 Q. He came to your house.
15 A. Yes, sir.
16 Q. All right. When I asked you while ago did
17    you know how to find Joey Barnes and you
18    kind of laughed, is he still around over
19    there in --
20       What's the name of that town on that
21    door?
22 A. That's Iuka.
23 Q. Is he still around in Iuka?

Page 131

1  A. I can't say what town he's living in, but I
2     know he's still around.
3  Q. You didn't know much about him, then, when
4     you went to work for him, did you?
5  A. Not really, no, sir.
6  Q. All right. And you're telling me you don't
7     have a clue how to find him today.
8        MR. WARD: Form.
9  A. No, sir, not really.
10 Q. Now, what was he supposed to furnish? He
11    was going to furnish the loads, and he
12    furnished you a DOT number; is that right?
13 A. His authorities.
14 Q. Okay. What did that mean to you?
15 A. It means everything that went on my truck
16    had to go through Joey Barnes.
17 Q. Did you -- What kind of arrangement did you
18    have with Joey Barnes about the insurance?
19 A. The insurance is in his name.
20 Q. How do you know that?
21 A. Because the name that appears on a truck
22    door, that's the name the insurance has to
23    be in.

Case 2:07-cv-00882-MHT-SRW    Document 21-3    Filed 02/08/2008    Page 4 o

Page 132

1  Q. Did you pay anything for the insurance?
2  A. Yes, sir.
3  Q. How much did you pay?
4  A. It's 600 a month.
5  Q. Who did you pay that to?
6  A. To the insurance company.
7  Q. And who was the insurance company?
8  A. Transportation Insurance.
9  Q. Okay. Are they in Booneville?
10 A. Yes, sir.
11 Q. All right. And this tractor was a '93
12    International; is that right?
13 A. Yes, sir.
14 Q. Have you ever been told that you do not
15    have liability insurance? Anybody told you
16    you do not have liability insurance?
17       MR. WARD: Form.
18 A. No, sir.
19 Q. Do you, as far as you know, have liability
20    insurance?
21 A. Yes, sir.
22 Q. Who is it with?
23 A. It was with Canal.

33 (Pages 129 to 132)

Deposition of Billy Gene Michael

Page 133

1   Q.  All right.  And that's through the agent
2        Transportation Insurance Services in
3        Booneville, Mississippi?
4   A.  Yes.
5   Q.  And when you would make your payments to
6        them, how would you make them?
7   A.  Cash.
8   Q.  Who did you make them to?  Any particular
9        person in there?
10  A.  Most of the time it would be to Karen Edge.
11  Q.  Karen Edge?
12  A.  Yes, sir.
13  Q.  All right.  Would they give you a receipt?
14  A.  Yes, sir.
15  Q.  Is it true that there's not any dispute
16       between you and Canal Insurance Company
17       about whether you have liability coverage
18       that covers you for this wreck?
19          MR. WARD:  Form.
20  A.  I've not heard nothing from Canal.