IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

CANAL INSURANCE COMPANY,    )
                            )
    Plaintiff,              )
                            )
BILLY GENE MICHAEL, an individual;    )
JOEY BARNES, individually and d/b/a    )    CIVIL ACTION NUMBER:
BAD J TRUCKING COMPANY;    )    2:07CV882-MHT
CANDACE M GROSE, as personal    )
representative of the Estate of JAKOB    )
A. GROSE; et al.    )

## CANAL INSURANCE COMPANY'S
## MOTION FOR SUMMARY JUDGMENT

COMES the Plaintiff, Canal Insurance Company, pursuant to Rule 56 of the Federal

Rules of Civil Procedure, and moves this Court for summary judgment in its favor on the

grounds that there is no genuine issue of any material fact, and Canal is entitled to judgment as a

matter of law.  Canal further moves the Court to make said judgment in its favor final, pursuant

to Rule 54(b) of the Federal Rules of Civil Procedure on the grounds that there is no just cause

for delay.

In support of this Motion for Summary Judgment, Canal Insurance Company says as

follows:

## SUMMARY OF MATERIAL FACTS

### A. PROCEDURAL SUMMARY

Canal Insurance Company filed this action seeking a declaration that it has no duty to

defend or to indemnity Billy Gene Michael or Joey Barnes, individually and/or d/b/a Bad J

1

Trucking Company, from claims asserted by Candace M. Grose, as personal representative of the

Estate of Jakob A. Grose (hereinafter referred to as "Candace M. Grose"). Those claim arise out

of an April 7, 2005 motor vehicle accident involving a tractor trailer operated by Billy Gene

Michael and an automobile operated by Jakob A. Grose in or near U.S. Highway 231 in

Montgomery County, Alabama. (See Complaint for Declaratory Judgment).

On October 10, 2006, Candace M. Grose filed a wrongful death claim in the Circuit Court

of Montgomery County, Alabama against Billy Gene Michael and various fictitious defendants

(hereinafter referred to as "underlying lawsuit"). On November 6, 2006, the complaint in the

underlying lawsuit was amended to name Billy Gene Michael; Bad J Trucking Company; Joey

Barnes, an individual; Joey Barnes, d/b/a Bad J Trucking Company; and various fictitious parties

as defendants. (See Complaint and First Amended Complaint in underlying lawsuit, attached as

exhibits to Complaint for Declaratory Judgment).

Candace M. Grose alleged in the underlying lawsuit that on or about April 7, 2005, the

defendants Billy Gene Michael, Bad J Trucking Company, Joey Barnes individually and d/b/a

Bad J Trucking Company, along with the fictitious defendants, were operating an 18-wheel

tractor trailer rig within Montgomery County, Alabama, on U.S. Highway 231; that the

defendants negligently or wantonly caused or allowed the tractor trailer rig to pull out of a private

drive, across U.S. 231 South and completely block the path of Jakob A. Grose; and that as a

result, the vehicle being driven by Jakob A. Grose collided with the defendants' rig, causing

injuries to Jakob A. Grose, from which he died. The First Amended Complaint in the underlying

lawsuit further purports to state claims against Bad J Trucking Company, Joey Barnes

individually and/or d/b/a Bad J Trucking, and various fictitious defendants, for negligent hiring,

2

training and supervision of Billy Gene Michael; negligent entrustment of the 18-wheel tractor

trailer rig to Billy Gene Michael; negligent inspection or maintenance of the tractor trailer rig

being operated by Billy Gene Michael at the time of the subject accident; and various liability for

the acts, errors and/or omissions of Billy Gene Michael.  (See Complaint and First Amended

Company in the underlying lawsuit, attached as exhibits to Complaint for Declaratory Judgment).


## B.  INSURANCE POLICY LANGUAGE

At the time of the subject accident, Joey Barnes d/b/a Bad J Trucking had in effect a basic

auto liability policy with Canal Insurance Company, policy number 395497, with a policy period

of March 28, 2003, until canceled, listing Joey Barnes d/b/a Bad J Trucking as the named

insured.  Under Section A - Basic Automobile Liability Insurance, the policy provides as follows:

I.    **COVERAGE A - BODILY INJURY LIABILITY - COVERAGE B -**
      **PROPERTY DAMAGE LIABILITY:**

      The company will pay on behalf of the **insured** all sums which the

      **insured** shall become legally obligated to pay as damages because

      of **bodily injury** or **property damage** to which this insurance

      applies, caused by an **occurrence** and arising out of the ownership,

      maintenance or use, including loading and unloading, for the

      purposes stated as applicable thereto in the declaration, of an

      **owned automobile** or of a **temporary substitute automobile** . . .

      . . .

      **Exclusions:** This insurance does not apply:

3

. . .

(f) to bodily injury or property damage arising out of the

ownership, maintenance, operation, use, loading or unloading of

any owned automobile or temporary substitute automobile while

such automobile is being used as a public or livery conveyance,

**unless such use is specifically declared and described in the**

**declarations**. (emphasis added).

(See Exhibit "C" to Complaint for Declaratory Judgment; See Affidavit of Era E.

Horner, Jr.).

The subject insurance policy is a scheduled vehicle policy, and at one time, listed the

1993 International tractor, which was owned by Billy Gene Michael and which he was operating

at the time of the subject accident, as a covered vehicle under the policy. However, prior to the

date of the subject accident, and more specifically, on April 2, 2005, the 1993 International

tractor had been deleted from the Canal policy pursuant to an April 2, 2005 E-3L endorsement,

and following Joey Barnes' notice to Billy Gene Michael on April 1, 2005 that his 1993

International tractor would be removed from the subject policy, and that Billy Gene Michael had

twenty-four hours to remove the Bad J Trucking placards and USDOT authority from that tractor.

(See Affidavit of Era E. Horner, Jr.)

## C. FACTUAL SUMMARY

Billy Gene Michael operated his 1993 International tractor, under Joey Barnes d/b/a Bad J

Trucking's DOT number, pursuant to a lease agreement dated November 8, 2004, between

Michael and Barnes. Although the agreement was not signed by Billy Gene Michael, it did memorialize the agreement between Michael and Barnes. A copy of the agreement was given to Billy Gene Michael. (Deposition of Joey Barnes, page 33, 62, 83-86, 109-110; Exhibit 9 to deposition of Joey Barnes). The agreement provided that by Billy Gene Michael's act of applying the decals of Bad J Trucking to his truck, paying the required fifteen percent, and getting his insurance through Transportation Insurance, he shall consider his truck leased to Bad J Trucking. (Deposition of Joey Barnes, page 111).

In November of 2004, Joey Barnes told his insurance agent, Karen Edge of Transportation Insurance Services, Inc., to add Billy Gene Michael's 1993 International tractor, VIN number 1MSRACAN3PH465116, to his insurance policy. (Deposition of Joey Barnes, pages 63-64). Billy Gene Michael's 1993 International tractor, VIN number 1MSRACAN3PH465116, was added to the policy on November 10, 2004. (See Deposition of Karen Edge, pages 14-15, 19-21).

Joey Barnes terminated Billy Gene Michael on April 1, 2005 for failing to pay for his insurance, and advised him that his insurance was being cancelled as of April 2, 2005. (Deposition of Joey Barnes, page 47, 53, 59, 131-132; Deposition of Karen Edge, page 68). Joey Barnes also forwarded a letter to Billy Gene Michael on April 1, 2005, confirming that his lease was terminated for failure to keep his insurance paid. (Deposition of Joey Barnes pages 113, 133 and Exhibit 10).

On April 1, 2005, Joey Barnes called his insurance agent, Karen Edge of Transportation Insurance Services, Inc., and told her to take Billy Gene Michael's tractor off his policy because he had been terminated. (Deposition of Joey Barnes, page 66-68; Deposition of Karen Edge,

5

pages 40, 44). Karen Edge told Joey Barnes that Billy Gene Michael's tractor would be removed from the policy effective April 2, 2005 at 12:01 a.m. (Deposition of Joey Barnes, page 68). Joey Barnes sent a letter to Karen Edge on April 2, 2005 confirming that Billy Gene Michael's tractor had been removed from his policy of insurance. (Deposition of Joey Barnes, page 68).

Karen Edge spoke with Billy Gene Michael on April 1, 2005, and Ms. Edge told Billy Gene Michael that his unit was being deleted by Joey Barnes. (See Deposition of Karen Edge, pages 40, 44).

Prior to April 2, 2005, a 1993 International tractor, vehicle identification number 1MSRACAN3PH465116 (hereinafter "the 1993 International") had been listed as a covered vehicle under the subject Canal policy. On April 1, 2005, Horner Insurance Services, Inc. (hereinafter "Horner"), acting as general agent for Canal Insurance Company, received a request via facsimile from Transportation Insurance Services, Inc. (hereinafter "Transportation Insurance"), the agent of the named insured, Joey Barnes d/b/a Bad J Trucking, to delete the 1993 International from coverage, effective April 2, 2005 at 12:01 a.m. (See Affidavit of Era E. Horner, Jr.)

In response to this request, Horner issued a Change of Vehicle Endorsement terminating coverage of the 1993 International. A clerical error was made in the effective date and times of this endorsement; instead of making the endorsement effective April 2, 2005 at 12:10 a.m. as requested, the endorsement was made effective April 1, 2005 at 1:56 p.m., the time and date that the request was processed. (See Affidavit of Era E. Horner, Jr.)

On April 11, 2005, Horner received a follow-up request from Transportation Insurance, via fax, requesting that Horner correct the effective date on the endorsement. In response to this

6

request, Horner issued two additional Change of Vehicle Endorsements. One endorsement added the 1993 International back to the subject Canal policy, effective April 1, 2005 at 1:56 p.m. Simultaneously, Horner issued a Change of Vehicle Endorsement excluding the 1993 International from coverage effective April 2, 2005 at 12:01 a.m. The combined effect of these two endorsements was correct the clerical error of the effective date of termination of coverage, for the 1993 International, extending coverage to April 2, 2005 at 12:01 a.m. **There was no coverage for the 1993 International under the subject Canal policy after April 2, 2005 at 12:01 a.m.** (See Affidavit of Era E. Horner, Jr; See deposition of Karen Edge, page 37, 40.)

After Billy Gene Michael was notified that his lease agreement with Bad J Trucking was being terminated as of April 1, 2005 due to his failure to pay insurance premiums, and after Billy Gene Michael was notified by Joey Barnes and Karen Edge that his 1993 International tractor was being deleted from Joey Barnes d/b/a Bad J Trucking's insurance policy effective April 2, 2005, Billy Gene Michael was involved in the April 7, 2005 motor vehicle accident made the basis of the underlying lawsuit. (See Affidavit of Era E. Horner, Jr.; See Deposition of Karen Edge pages 40-44; See Deposition of Joey Barnes, pages 47, 53, 59, 131-132; See Complaint for Declaratory Judgment).

————————————

In support of this Motion for Summary Judgment, Canal Insurance Company relies on the following:

1.    The pleadings in this case;

2..    The Affidavit of Era E. Horner, Jr., a copy of which is attached hereto,

incorporated herein, made a part hereof, and marked Exhibit "A";

3.    Transcript of the deposition of Karen Edge of Transportation Insurance Services, Inc., pages 14-15, 19-21, 40, 44, 68 of which are attached hereto, incorporated herein, made a part hereof, and marked Exhibit "B";

4.    Transcript of the deposition of Joey Barnes, pages 33, 47, 53, 59, 62-64, 66-68, 83-86, 109-111, 113, 131-133 and Exhibits9 and 10 of which are attached hereto, incorporated herein, made a part hereof, and marked Exhibit "C".

---

It is without dispute that Billy Gene Michael's 1993 International tractor was deleted from Canal's policy with Bad J Trucking on April 2, 2005, at 12:01 a.m., some five days prior to the date of the subject accident.   Accordingly, at the time of the accident of April 7, 2005, Billy Gene Michael's tractor was not listed on Bad J Trucking's policy with Canal Insurance Company, and accordingly, Canal Insurance Company has no duty to defend or to indemnify the claims in the underlying lawsuit.

Furthermore, the lease agreement between Joey Barnes d/b/a Bad J Trucking and Billy Gene Michael was terminated on April 1, 2005 when Joey Barnes orally notified Billy Gene Michael that his lease was terminated as of that date.   Additionally, Joey Barnes effectively terminated the lease agreement with Billy Gene Michael on April 1, 2005 when he sent a letter to Michael confirming termination of the lease agreement.   See Graham v. Malone Freight Lines, 314 F.3d 7, 14-15 (1st Cir. 1999).   Given the effective termination of the lease agreement prior to the subject accident, Canal Insurance Company does not have any obligation to defend or to

8

indemnify in the underlying lawsuit.  See Canal Insurance Company v. Jackson, 101 F.3d 1083

(5th Cir. 1996).


                                        /s/ Jack J. Hall
                                        Jack J. Hall, Attorney for Plaintiff,
                                        Canal Insurance Company

**OF COUNSEL:**
HALL, CONERLY & BOLVIG, P.C.
505 N. 20th Street, Suite 1400
Birmingham, AL 35203
(205) 251-8143
fax: (205) 326-3202

## CERTIFICATE OF SERVICE

        I do hereby certify that I have on this 12th day of February, 2008, served a true and correct
copy of the above pleading on all counsel of record by placing same in the United States Mail,
postage prepaid and properly addressed to:

William E. Brittain
Ball, Ball, Matthews & Novak, P.A.
P.O. Box 2148
Montgomery, AL 36102
ebrittain@ball-ball.com

David E. Allred
DAVID E. ALLRED, P.C.
P.O. Box 241594
Montgomery, AL 36124
dallred@allredpclaw.com

                                        /s/ Jack J. Hall
                                        OF COUNSEL

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

CANAL INSURANCE COMPANY,                )
                                        )
    Plaintiff,                          )
                                        )
vs.                                     )    2:07-CV-882-MHT
                                        )
BILLY GENE MICHAEL, an individual;      )
JOEY BARNES, individually and d/b/a     )
BAD J TRUCKING COMPANY;                 )
CANDACE M. GROSE, as personal           )
representative of the Estate of         )
JAKOB A. GROSE; et al.                  )

## AFFIDAVIT

Before me the undersigned notary public, in and for County and State, came and appeared

Era E. Horner, Jr., who upon oath deposes and says as follows:

    1)    My name is Era E. Horner, Jr. I am employed by Horner Insurance Services, Inc.

in Memphis, Tennessee. I am over the age of 21, of sound mind and have personal knowledge of

the facts and matters stated in this Affidavit.

    2)    Horner Insurance Services, Inc. is a general insurance agency located in Memphis,

Tennessee.

    3)    Horner Insurance Services, Inc acted as a general agent for Canal Insurance

Company in the placing of certain liability insurance coverage for Joey Barnes, d/b/a Bad J

Trucking with Canal Insurance Company.

    4)    Transportation Insurance Services, Inc. was also involved in placement of this

coverage and functioned as a producing agent for Joey Barnes d/b/a Bad J. Trucking.

    5)    Canal Insurance Company issued a Basic Automobile Liability Policy to Joey Barnes

d/b/a Bad J Trucking, as the named insured, policy umber 395497, with coverage beginning March

28, 2003 and effective until canceled (hereinafter "The Policy"). Prior to April 2, 2005, a 1993

1



EXHIBIT
A

International tractor, vehicle identification number 1MSRACAN3PH465116 (hereinafter "The 1993 International") had been listed as a covered vehicle under The Policy.

6)    On April 1, 2005, Horner Insurance Services, Inc received a request via facsimile from Transportation Insurance Services, Inc., the agent of the named insured, to delete The 1993 International from coverage, effective April 2, 2005 at 12:01 am. A copy of that request is attached as Exhibit "A."

7)    In response to this request, Horner Insurance Services, Inc. issued a Change Of Vehicle Endorsement terminating coverage of The 1993 International, a copy of which is attached hereto as Exhibit "B." A clerical error was made in the effective date and time of this Endorsement. Instead of making it effective April 2, 2005 at 12:01 am, as requested, the Endorsement (Exhibit "B") was made effective April 1, 2005 at 1:56 p.m., the time and date that the request was processed.

8)    On April 11, 2005, we received a follow up request from Transportation Insurance Services, Inc. via fax requesting that we correct the effective date on the Endorsement (Exhibit "B"). A copy of that request this attached hereto as Exhibit "C."

9)    In response to this request, we issued two additional Change Of Vehicle Endorsements. One Endorsement added The 1993 International back to The Policy, effective April 1, 2005 at 1:56 p.m. That Endorsement is attached hereto as Exhibit "D." Simultaneously, we also issued a Change Of Vehicle Endorsement excluding The 1993 International from coverage effective April 2, 2005 at 12:01 am. A copy of that Endorsement is attached as Exhibit "E." The combined effect of these two Endorsements was to correct the clerical error of the effective date of termination of coverage, for The 1993 International, extending coverage to April 2, 2005 at 12:01 am.

10)    There was no coverage for The 1993 International in The Policy after April 2, 2005 at 12:01 am.

2

Done this 8th of February, 2008.

_____
Era E. Horner, Jr.

_____
Notary Public

My commission ends: _____ My Commission Expires November 9, 2011



_____

3

APR-01-05 FRI 02:00 PM  TRANSPORTATION INSURANCE    FAX NO. 662 7201163              P. 01/01

## Transportation Insurance Services, Inc.
### P.O. Box 328
### Booneville, MS  38829
### Phone:  662-720-1150
### Fax:  662-720-1163

---

A Fax From 'Faye Tackett'          1 Page

---

# 4/1/2005

To: Horner Insurance Services, Inc
Attn:  Endorsement Dept.

Re: Bad J Trucking        395497, MTC330292, A370579

**Please delete the following leased unit and driver from above named policies effective 12:01AM, 4/2/05.**

**1993 International #  1MSRACAN3PH465116**

**Billy Michael**

Thank you,

Faye



EXHIBIT

A

04/01/2005 FRI 13:55 [TX/RX NO 7799] ☑001

141252965

# Change of Vehicle Endorsement - Liability

It is agreed that policy to which this endorsement is attached is amended
(1) to EXCLUDE coverage on the following described vehicle(s).

| Vehicle # | Year/Trade Name/Model/Body Type | Motor Vehicle Identification # | Annual Premium |
|---|---|---|---|
| 5 | 1993 INTERNATIONAL  TRACTOR * LEASE TERMINATED | 1MSRACANSPH465116 | -6,021.00 |

(2) to INCLUDE coverage on the following described vehicle(s).

| Vehicle # | Year/Trade Name/Model/Body Type | Radius (miles) | Garage Location | Annual Premium |
|---|---|---|---|---|
|  |  |  |  |  |

PK 1

ADDITIONAL PREMIUM:                    RETURN PREMIUM:  SEE BELOW

4/1/2005 - 5/1/2005 Breakdown for policies under installment premium payment plan:
XXXXXXXXXXXXX   -502.00            ESCROW  DEPOSIT    -1,004.00
The remaining  monthly  installments due will change by  -502.00    from  1,004.00
to  502.00  beginning with the installment due  5/1/2005

Policy Number  395497        Endorsement Effective Time XX:XX:XX  1:56 PM    Endorsement Effective Date  04/01/2005

Insured  JOEY BARNES DBA BAD J TRUCKING                    Expiration Date  Until Cancelled

Issue Date  04/04/2005 Authorized Signature _____

HORNER INSURANCE SERVICES, INC

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED

# Canal Insurance Company
Greenville, South Carolina

Form E-3L                                         (Rev. 4-1994)


EXHIBIT
B

4105245157

APR-11-05 MON 03:23 PM TRANSPORTATION INSURANCE   FAX NO. 6    201163          P. 01/01

Transportation Insurance Services, Inc.
P.O. Box 328
Booneville, MS 38829
Phone: 662-720-1150
Fax: 662-720-1163

A Fax From 'Faye Tackett'          1 Page

# 4/1/2005

To: Horner Insurance Services, Inc
Attn:  Endorsement Dept.

Re: Bad J Trucking        395497, MTC330292, A370579

Please delete the following leased unit and driver from above
named policies effective 12:01AM, 4/2/05.

1993 International # IMSRACAN3PH465116

Billy Michael

*4-11-05*
*Please correct dates*
*on endorsement to*
*4-2-05 instead of*
*4-1-05.*
*On above policies.*
*Thanks*

Thank you,

Faye

EXHIBIT
C

04/11/2005 MON 15:18 [TX/RX NO 8540] ☒001

14125723

# Change of Vehicle Endorsement - Liability

It is agreed that policy to which this endorsement is attached is amended
(1) to EXCLUDE coverage on the following described vehicle(s).

| Vehicle # | Year/ Trade Name/ Model/ Body Type | Motor Vehicle Identification # | Annual Premium |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

(2) to INCLUDE coverage on the following described vehicle(s).

| Vehicle # | Year/Trade Name/Model/Body Type | Radius (miles) | Garage Location | Annual Premium |
|---|---|---|---|---|
| 5 | 1993 INTERNATIONAL  TRACTOR * LEASE TERMINATED 1MSRACAN3PH465118 | UNL | IUKA, MS | 6,021.00 |

PR 1 -

ADDITIONAL PREMIUM:  **SEE BELOW**          RETURN PREMIUM: _____

4/1/2005 - 5/1/2005 Breakdown for policies under installment premium payment plan:
~~XXXXXXXXXX~~    502.00
The remaining __monthly__ installments due will change by __502.00__     ESCROW DEPOSIT     1,004.00
to    1,004.00                    beginning with the installment due    5/1/2005     from   502.00

Policy Number __395497__    Endorsement Effective Time ~~XXXXXX~~ 1:58 PM    Endorsement Effective Date __04/01/2005__

Insured __JOEY BARNES DBA BAD J TRUCKING__                                    Expiration Date __Until Cancelled__

Issue Date __04/15/2005__ Authorized Signature _____

HORNER INSURANCE SERVICES, INC

## ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED
## Canal Insurance Company

Form S-3L                        Greenville, South Carolina                (Rev. 4-1994)



EXHIBIT

D

4106247370

141257240

# Change of Vehicle Endorsement - Liability

It is agreed that policy to which this endorsement is attached is amended
(1) to EXCLUDE coverage on the following described vehicle(s).

| Vehicle # | Year/ Trade Name/Model/ Body Type | Motor Vehicle Identification # | Annual Premium |
|---|---|---|---|
| 5 | 1996 INTERNATIONAL   TRACTOR * LEASE TERMINATED | 1MSRACAN3PH465116 | -6,021.00 |

(2) to INCLUDE coverage on the following described vehicle(s).

| Vehicle # | Year/Trade Name/Model/Body Type | Radius (miles) | Garage Location | Annual Premium |
|---|---|---|---|---|
| | | | | |

PR 1

ADDITIONAL PREMIUM: _____          RETURN PREMIUM: __SEE BELOW__

| | |
|---|---|
| 4/2/2005 – 5/1/2005 Breakdown for policies under installment premium payment plan: | |
| XXXXXXXXXXXX    -485.00 | ESCROW  DEPOSIT    -1,004.00 |
| The remaining __monthly__ installments due will change by  -502.00    from  1,004.00 | |
| to    502.00 _____ beginning with the installment due    5/1/2005 | |

Policy Number __395497__    Endorsement Effective Time 12:01 AM _____    Endorsement Effective Date 04/02/2005

Insured __JOEY BARNES DBA BAD J TRUCKING__    Expiration Date  Until Cancelled

Issue Date __04/15/2005__ Authorized Signature _____

HORNER INSURANCE SERVICES, INC

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED

## Canal Insurance Company

Greenville, South Carolina

Form E-SL                                                                        (Rev. 4-1994)

4106247373


EXHIBIT
E

**1**

```
 1            IN THE CIRCUIT COURT
 2                   FOR
 3        MONTGOMERY COUNTY, ALABAMA
 4
 5    CANDACE M. GROSE
 6
 7    VS.
 8
 9    BILLY GENE MICHAEL, ET AL
10
11         CV-06-900085
12
13    *  *  *  *  *  *  *  *
14         IT IS STIPULATED AND AGREED, by and
15    between the parties through their
16    respective counsel, that the deposition of
17    KAREN EDGE may be taken before Robert E.
18    Rice, Commissioner, and Notary Public,
19    State at Large, at Booneville, Mississippi,
20    on December 6, 2007, beginning at
21    10:15 a.m.
22
23
```

RICE COURT REPORTING (256) 332-4074

**2**

```
 1          S T I P U L A T I O N S
 2       IT IS FURTHER STIPULATED AND AGREED that
 3    the signature to and reading of the
 4    deposition by the witness is waived, the
 5    deposition to have the same force and
 6    effect as if full compliance had been had
 7    with all laws and rules of Court relating
 8    to the taking of depositions.
 9       IT IS FURTHER STIPULATED AND AGREED that
10    it shall not be necessary for any
11    objections to be made by counsel to any
12    questions, except as to form or leading
13    questions, and that counsel for the parties
14    may make objections and assign grounds at
15    the time of the trial, or at the time said
16    deposition is offered in evidence, or prior
17    thereto.
18       IT IS FURTHER STIPULATED AND AGREED that
19    notice of filing of the deposition by the
20    Commissioner is waived.
21
22
23
```

RIC...(256) 332-4074

**3**

```
 1              A P P E A R A N C E S
 2
 3    FOR THE PLAINTIFF:
 4
 5      Mr. David E. Allred
        Attorney at Law
 6      P.O. Box 241594
        Montgomery, Alabama 36124-1594
 7
 8
      FOR THE DEFENDANT:
 9
10
        Mr. James M. Strong
11      Attorney at Law
        Miller, Hamilton, Snider & Odom
12      505 20th Street North
        Suite 500
13      Birmingham, Alabama 35203
14      BY TELEPHONE:
        Mr. T. Kent Garrett
15      Attorney at Law
        Rushton, Stakely, Johnston & Garrett
16      P.O. Box 270
        Montgomery, Alabama 36101-0270
17
18
19
20
21
22
23
```

RICE COURT REPORTING (256) 332-4074

**4**

```
 1                 I N D E X
 2    EXAMINATION BY MR. STRONG:  6 - 73
 3    EXAMINATION BY MR. ALLRED: 73 - 125
 4
 5
 6
 7           E X H I B I T   L I S T
 8
 9    DEFENDANT'S EXHIBIT   1    8
10    DEFENDANT'S EXHIBIT   2   21
11    DEFENDANT'S EXHIBIT   3   18
12    DEFENDANT'S EXHIBIT   4   25
13    DEFENDANT'S EXHIBIT   5   27
14    DEFENDANT'S EXHIBIT   6   28
15    DEFENDANT'S EXHIBIT   7   28
16    DEFENDANT'S EXHIBIT   8   33
17    DEFENDANT'S EXHIBIT   9   53
18    DEFENDANT'S EXHIBIT  10   53
19    DEFENDANT'S EXHIBIT  11   54
20    DEFENDANT'S EXHIBIT  12   55
21    DEFENDANT'S EXHIBIT  13   56
22    DEFENDANT'S EXHIBIT  14   56
23    DEFENDANT'S EXHIBIT  15   59
```

RICE COURT REPORTING (256) 332-4074

13

1  about today, did it come through Horner?

2  A.  Yes.

3  Q.  About how much of your business

4  percentage-wise, if you know, is written

5  under Canal policies?

6  A.  Of the commercial business I'm

7  going to say seventy-five percent.

8  Q.  And is Canal only written on a

9  commercial basis?

10  A.  Yes.

11  Q.  So you also write residential

12  insurance as well?

13  A.  Yes.

14  Q.  You do both homeowners, auto?

15  A.  Yes.

16  Q.  Okay, and how much of that

17  seventy-five percent of commercial

18  insurance through Canal comes through

19  Horner?  Do you have an estimate?

20  A.  I don't really have an estimate.

21  It's probably a hundred thousand dollars

22  worth a month.

23  Q.  How much commercial do you write a

RICE COURT REPORTING (256) 332-4074

14

1  month on average?  Do you know?

2  A.  I'm going to say probably four

3  hundred thousand.

4  Q.  So that looks like it would be

5  about a quarter of your commercial would be

6  Canal if you write four hundred thousand?

7  A.  Well, more than that would be Canal

8  because I write Canal through different

9  GA's.

10  Q.  Oh, okay.  You're talking only

11  through Horner?

12  A.  Canal is territorial.

13  Q.  Okay, so the hundred thousand a

14  month comes from Horner?

15  A.  Yes.

16  Q.  And then the other three hundred

17  thousand comes through?

18  A.  Other Canal GA's.

19  Q.  Other Canal GA's, okay.  I'm going

20  to get right into it.  The policy we're

21  here about today was a policy issued to Bad

22  J Trucking.  Is that correct?

23  A.  That's correct, yes.

RICE COURT REPORTING (256) 332-4074

15

1  Q.  Do you have the policy number in

2  front of you?

3  A.  Yes.

4  Q.  Can you tell us what that is?

5  A.  The policy number is 395497.

6  Q.  And exactly what kind of policy was

7  issued to Bad J Trucking?

8  A.  This is an auto liability policy.

9  Q.  Is it a commercial policy?

10  A.  Yes.

11  Q.  Do you know when the date was that

12  this policy was issued to Bad J Trucking?

13  A.  The original policy, I believe, was

14  issued in 2003.

15  Q.  Do you have a month?

16  A.  It would have probably been March,

17  March the 28th.

18  Q.  And why do you say that?

19  A.  Because that's the anniversary date

20  of all the policies that have been renewed.

21  Q.  Okay.  Between March 28th, 2003 and

22  March 28th, 2005, was the policy for Bad J

23  Trucking ever cancelled for any reason?

RICE COURT REPORTING (256) 332-4074

16

1  A.  It has been put into cancellation

2  for nonpayment of premium and then

3  reinstated once premium was received.

4  Q.  Do you know how many times it was

5  put into cancellation in that two year

6  period?

7  A.  Not exactly.  I'm going to say two

8  times at least.

9  Q.  And when Bad J Trucking would be

10  put on notice for that cancellation, how

11  would you do that?  In what manner would

12  you notify them?

13  A.  Well, we would send a request to

14  the insurance company or the general agent,

15  which would be Horner Insurance Services,

16  to cancel for nonpayment, and then they

17  would issue the cancellation notice and

18  forward a copy of it to Canal and to my

19  agency.

20  Q.  Would that be in writing?

21  A.  Yes.

22  Q.  Would Bad J Trucking or one of its

23  agents or its principal receive a copy of

RICE COURT REPORTING (256) 332-4074

17

1  that cancellation notice?

2      A.  Yes.

3      Q.  And who would send that copy of the

4  cancellation notice?

5      A.  Canal Insurance Company or Horner

6  Insurance Services.  I'm not sure which one

7  sends the cancellation notice to the

8  insured.

9      Q.  But it wouldn't come through you?

10     A.  It would not come through my

11 agency, no.

12     Q.  Do you ever receive a copy of that

13 cancellation notice?

14     A.  Yes.

15     Q.  Do you have a copy of one of those

16 in your file?

17     A.  Yes.

18     Q.  This is a notice of cancellation.

19 It looks like it's dated -- this is after

20 the date I had asked for.

21     A.  Well, this is when the policy was

22 actually cancelled.

23     Q.  Okay, I'm just looking for one that

RICE COURT REPORTING (256) 332-4074

18

1  may have been sent to them in between March

2  of 2003 and March of 2005.  I'm looking at

3  one that is dated cancellation will take

4  effect July 13th of 2004, and it lists

5  Canal Insurance Company as the insurance

6  company and Horner Insurance Services of

7  Memphis, Tennessee as the general agent,

8  and it says that there were notices sent to

9  Joey Barnes d/b/a Bad J Trucking, Horner

10 Insurance Services Inc., and Transportation

11 Insurance Services.  Did I read that

12 correctly, Ms. Edge?

13     A.  Yes.

14     Q.  This is your original, right?

15     A.  Yes.

16     Q.  I would like to mark this as

17 Defendant's Exhibit 3.  I haven't marked 2

18 yet.  Can we mark this and then make a copy

19 of it?  Would that be okay for you?

20

21     (WHEREUPON, Defendant's Exhibit 3

22 was marked for identification.)

23

RICE COURT REPORTING (256) 332-4074

19

1      A.  Yes.

2      Q.  Okay, so this shows, and correct me

3  if I'm wrong, that Joey Barnes d/b/a Bad J

4  Trucking was notified in writing of the

5  cancellation of their policy?

6      A.  Yes.

7      Q.  On July 13th, 2004?

8      A.  Yes.

9      Q.  Okay, and to the best of your

10 knowledge this policy was reinstated some

11 time after receipt of this?

12     A.  Yes.

13     Q.  In case you weren't aware, the

14 reason this lawsuit was filed is that there

15 was a car accident that was involved

16 between a Jakob Grose and Billy Michael,

17 who we're alleging was operating underneath

18 Bad J Trucking's DOT information on April

19 7th, 2005.

20     A.  Yes.

21     Q.  At the time of that accident was

22 the Bad J Trucking policy number 395497 in

23 effect?

RICE COURT REPORTING (256) 332-4074

20

1      A.  Yes.

2      Q.  Now, my client, Billy Michael, was

3  he at any point in time listed on the

4  insurance policy as a covered vehicle?

5      A.  Yes.

6      Q.  Okay, and was Mr. Michael's name

7  ever on the policy?

8      A.  Only as a driver.

9      Q.  Only as a driver?  So does that not

10 give him status as a named insured?

11     A.  No.

12     Q.  Do you know when Mr. Michael's

13 vehicle was added to the Bad J Trucking

14 policy?

15     A.  November the 10th, 2004.

16     Q.  And do you have a copy -- well,

17 actually I have here what's called a Status

18 Summary Sheet, and I believe this shows

19 that his vehicle was added on 11/10/2004.

20 Is that correct?

21     A.  That is correct.

22     Q.  Okay, if you could please, could

23 you tell what kind of vehicle was added and

RICE COURT REPORTING (256) 332-4074

DEPOSITION OF: KAREN EDGE

21

1   read the VIN number into the record please?

2

3        MR. ALLRED: Is that Exhibit 2?

4        MR. STRONG: Yes, that's going to

5   be Defendant's Exhibit 2, the Status

6   Summary Sheet from the Canal policy.

7

8        (WHEREUPON, Defendant's Exhibit 2

9        was marked for identification.)

10

11       A.  It's a 1993 International tractor,

12  VIN number 1MSRACAN3PH465116.

13       Q.  Okay. When Mr. Michael's

14  International tractor was added to the

15  policy, do you know if he was to pay the

16  premiums or if Bad J Trucking was to pay

17  the premiums?

18       A.  He and Bad J Trucking came into my

19  office to add this unit to the policy.

20       Q.  Well, when you say Bad J Trucking,

21  you mean Mr. Barnes?

22       A.  Joey Barnes came into our office to

23  add it to the policy, and Mr. Barnes knew

RICE COURT REPORTING (256) 332-4074

22

1   that he was responsible for paying the

2   premium to our agency, but on this day he

3   had Billy Michael to pay $750 toward the

4   deposit.

5        Q.  And what do you mean by toward the

6   deposit?

7        A.  The deposit to add his truck to the

8   insurance was $1,344, and he paid $750 and

9   was supposed to pay the balance when the

10  endorsement was processed.

11       Q.  Okay, so the total amount for his

12  truck was to be?

13       A.  The deposit premium was to be

14  $1,344, and then he was supposed to pay a

15  monthly premium of $672.

16       Q.  Now, that deposit premium, $1,344,

17  what is that for?

18       A.  That's the amount of deposit that

19  the insurance company requires to place the

20  coverage.

21       Q.  That's not escrow or anything like

22  that?

23       A.  It is an escrow deposit, yes.

RICE COURT REPORTING (256) 332-4074

23

1        Q.  So if an individual does not pay a

2   monthly premium on time, can money be taken

3   out of that escrow account to make up?

4        A.  No.

5        Q.  Okay. Is that money ever touched

6   at any time?

7        A.  The money is only touched if the

8   unit is taken off the policy and the

9   premiums are not paid up-to-date, then that

10  money would be used to pay any unpaid

11  premiums at the time of the termination of

12  the policy.

13       Q.  So if I've got that right, that

14  money is only taken out to pay for premiums

15  that are not paid?

16       A.  Upon cancellation of the policy or

17  upon termination of the vehicle.

18       Q.  And if there's money left in that

19  amount, that would go back to the gentleman

20  or the entity or person that placed that

21  money into escrow?

22       A.  That's correct.

23       Q.  Okay. And I believe you said that

RICE COURT REPORTING (256) 332-4074

24

1   Mr. Michael's premium of the total premium

2   monthly for Bad J Trucking was $502?

3        A.  It was $672.

4        Q.  If we can look again at Defendant's

5   Exhibit 2, it shows a premium, monthly

6   premium of $497.

7        A.  That's for the liability portion of

8   the policy. He also had a $100 per month

9   cargo premium and $75 per month physical

10  damage insurance premium.

11       Q.  So $497 liability, $100 cargo?

12       A.  Yes.

13       Q.  And $50?

14       A.  $75.

15       Q.  And what was that for?

16       A.  That was for physical damage.

17       Q.  And that totals $672?

18       A.  That's correct.

19       Q.  I've got here what I would like to

20  mark as Defendant's Exhibit 4, and it

21  appears to be a Transportation Insurance

22  Services, Inc. receipt number 49980 dated

23  11/10/2004 in the amount of $750 indicating

RICE COURT REPORTING (256) 332-4074

37

1  delinquency, they will not take money out
2  of that account unless the vehicle is
3  terminated from the policy, correct?
4      A.  That's correct.
5      Q.  Mr. Michael was added to the policy
6  on November 10th, 2004, correct?
7      A.  That's correct.
8      Q.  And when was Mr. Michael terminated
9  from the policy?
10      A.  He was terminated from the policy
11  on April the 2nd, 2006.
12      Q.  So he was on the policy for a
13  little less than five months. Is that
14  correct?
15
16      MR. ALLRED:  She said 2006.
17
18      A.  2005. I'm sorry. April the 2nd,
19  2005.
20      Q.  April the 2nd, 2005?
21      A.  Yes.
22      Q.  At the time of Mr. Michael's
23  alleged termination from the policy, how

RICE COURT REPORTING (256) 332-4074

38

1  much money should he have paid to Canal
2  Insurance either through Transportation
3  Insurance Services or anybody? Do you know
4  what that total amount of money should have
5  been?
6      A.  No, but I can total it up.
7      Q.  I'll give you the calculator, and
8  if you can, go ahead and total that up.
9      A.  He should have paid $1,354 in
10  escrow.
11      Q.  $1,354? I thought you said $1,344
12  earlier.
13      A.  Well, we had UM increase. That was
14  $10 increase, and the $3,836 in premium.
15      Q.  Can you tell me where the $3,836
16  comes from?
17      A.  I can. It was insurance premium.
18  From November the 10th, 2004 through
19  November the 30th, 2004 was $471. December
20  1, 2004 through December 31, 2004 was $672.
21  January 1, 2005 through January 31st, 2005
22  $672. February 1, 2005 through February
23  the 28th, 2005, $672. March 1, 2005

RICE COURT REPORTING (256) 332-4074

39

1  through March 31st, 2005, $672, and then he
2  had also been billed April 1, 2005 through
3  April the 30th, 2005, $677.
4      Q.  And that totals $3,836?
5      A.  Yes.
6      Q.  Okay. Do you know how much
7  Mr. Michael had paid to Transportation
8  Insurance Services on this policy? Can you
9  add those figures up for us?
10      A.  Yes. $3,159.
11      Q.  And of that $1,354 was in escrow?
12      A.  That's correct.
13      Q.  And at remainder would have been
14  applied to his premiums, correct?
15      A.  Correct.
16      Q.  So at the time of Mr. Michael's
17  alleged cancellation was he still in
18  arrears with the insurance?
19      A.  Yes.
20      Q.  Okay. Would he have had enough
21  money in his escrow account to cover what
22  his arreared premiums were?
23      A.  Almost. He still owed $22.50 after

RICE COURT REPORTING (256) 332-4074

40

1  his unit was deleted.
2      Q.  And when was his unit deleted?
3      A.  His unit was deleted from the
4  policy on April the 2nd, 2005.
5      Q.  Can you explain to us how
6  Mr. Michael was deleted from the policy?
7      A.  I was told to deleted his unit from
8  the policy by my insured Bad J Trucking,
9  which was Mr. Barnes. He called me and
10  told me to delete the policy on August the
11  2nd.
12      Q.  Did you just say August the 2nd?
13      A.  I mean April the 2nd of 2005. I
14  also spoke with Billy Michael on the first,
15  April the 1st, and told him that his unit
16  was being deleted by Mr. Barnes for
17  nonpayment of premium.
18      Q.  If Mr. Barnes were to testify that
19  that conversation never took place, would
20  you disagree with that?
21      A.  I would disagree, yes.
22      Q.  You don't keep copies of phone
23  records that far back, do you?

RICE COURT REPORTING (256) 332-4074

41

1   A.  I'm sure I could probably find the
2   phone record on it.  I'm sure I have a copy
3   of the phone bill.  I don't know.  If I can
4   find out what number he called from,
5   possibly I could find where I had the
6   conversation with him.
7   Q.  Do you know what phone number he
8   was calling from around that time in your
9   file?
10
11      MR. ALLRED:  Who are we talking
12  about, he?
13      MR. STRONG:  I'm sorry.
14  Mr. Michael.
15      MR. ALLRED:  You asked a little
16  while ago if Mr. Barnes said that
17  conversation never occurred.
18      MR. STRONG:  I'm sorry.  I meant to
19  say Mr. Michael.
20
21  A.  I would disagree with him.
22  Q.  If either Mr. Michael or Mr. Barnes
23  said that?

RICE COURT REPORTING (256) 332-4074

42

1   A.  If either one said it, I would
2   disagree.
3   Q.  Okay.  Do you have a copy of the
4   letter that you sent to, or did you send a
5   copy of a letter to Bad J Trucking
6   confirming that this cancellation was going
7   to take place?
8   A.  He received a copy.
9   Q.  Who's he?
10  A.  Joey Barnes received a copy of the
11  endorsement from the company after it had
12  taken place, after the deletion had taken
13  place.
14  Q.  Do you know when that would have
15  been delivered to Mr. Barnes?
16  A.  It should have been delivered to
17  him around April the 20th of 2005 because
18  that's when we received our copy from the
19  insurance company.
20  Q.  You said April 20th, 2005?
21  A.  Yes.
22  Q.  But Transportation Insurance
23  Services didn't send anything in writing to

RICE COURT REPORTING (256) 332-4074

43

1   Mr. Barnes himself indicating that we're
2   going to make the termination of the
3   Michael vehicle as indicated per a phone
4   call on such and such a day?
5   A.  No, we did not.
6   Q.  Do you do that in standard
7   practice?
8   A.  We do not do that.
9   Q.  So it's your practice to wait for
10  the insured to receive a changed
11  endorsement from the insurance provider, in
12  this instance being Canal?
13  A.  That's correct, before he would get
14  a copy that it was actually deleted.
15  Q.  Do you know if Mr. Barnes sent any
16  written notification to Mr. Michael
17  indicating that he was going to be deleted
18  from the policy?
19  A.  I don't know.
20  Q.  Do you know if Mr. Barnes ever
21  spoke to Mr. Michael about deleting his
22  tractor from the policy?
23  A.  I don't know.  He told me that he

RICE COURT REPORTING (256) 332-4074

44

1   did, but I don't know.
2   Q.  You may have told us, but can you
3   tell us what day, if you're aware, that you
4   spoke with Mr. Barnes regarding the
5   cancellation?
6   A.  I spoke with him on April the 1st,
7   2005.
8   Q.  And that's the same day you say you
9   spoke with Mr. Michael about it?
10  A.  I did, yes.
11  Q.  Did you call Mr. Michael?
12  A.  Mr. Michael called me.
13  Q.  Do you recall what Mr. Michael told
14  you in that conversation?
15  A.  I told him that Joey had asked for
16  his vehicle to be deleted from the policy
17  effective April the 2nd, and he argued with
18  me that he was not past due on his
19  insurance, and I told him that he was past
20  due and that he would still owe Joey Barnes
21  April the 1st premium because his policy
22  was staying on the policy one day in April.
23  Q.  But he wouldn't owe that whole

RICE COURT REPORTING (256) 332-4074

**65**

1    Q.   On the account card it looks like
2  in red -- we may have to mark these,
3  also and make a copy -- it says deleted '93
4  International in red handwriting on the
5  edge. Is that correct?
6    A.   That's correct.
7    Q.   And in black ink it says, looks
8  like, return escrow and return premiums.
9  Who would that money have gone to?
10    A.   It would have been applied to this
11  account.
12    Q.   Just the general account for Bad J
13  Trucking?
14    A.   Yes.
15    Q.   Do you know where Mr. Michael's
16  escrow money went?
17    A.   It would have been applied to the
18  account.
19    Q.   Just would have been applied to the
20  account?
21    A.   Yes.
22    Q.   And are these dates showing --
23    A.   These dates are incorrect.

RICE COURT REPORTING (256) 332-4074

**66**

1    Q.   You're now saying that the dates
2  listed on there --
3    A.   The April 1 was incorrect because
4  the company issued the endorsement deleting
5  his unit April the 1st, and we had asked
6  for April 2nd, so they came back and
7  reversed the April 1st and corrected them
8  to April 2nd.
9    Q.   But still the escrow money was
10  returned?
11    A.   It was, yes.
12    Q.   And it was returned from Canal to
13  Transportation Insurance Services?
14    A.   It was.
15    Q.   And would that have been applied to
16  overdue balances?
17    A.   Yes.
18    Q.   But you don't know exactly whose
19  overdue balance that would have been
20  applied to. Is that correct?
21    A.   It would have been applied to Bad
22  J's overdue balance, the Bad J account's
23  overdue balance.

RICE COURT REPORTING (256) 332-4074

**67**

1    Q.   Which would have included anything
2  Mr. Michael may have been in arrears for?
3    A.   It would have, yes.
4    Q.   But also anything Mr. Barnes
5  himself may have been in arrears for. Is
6  that correct?
7    A.   That's correct.
8    Q.   But there's no way to know whose
9  it's to take care of? I guess that's what
10  I'm asking.
11    A.   No.
12    Q.   Because as far as Transportation
13  Insurance Services is concerned, an overdue
14  balance is for the trucking company itself,
15  not for the individual trucks listed on the
16  policy.
17    A.   The overdue balance is the
18  responsibility of Bad J Trucking.
19    Q.   And/or Mr. Barnes?
20    A.   And/or Mr. Barnes, yes.
21    Q.   And Mr. Barnes' words to you, as
22  far as you can recall, were that
23  Mr. Michael did not pay him premiums for

RICE COURT REPORTING (256) 332-4074

**68**

1  the policy?
2    A.   That's correct.
3    Q.   You testified earlier that you're
4  unaware if Mr. Barnes told Mr. Michael that
5  he was being deleted, but did Mr. Barnes
6  ever tell you that he spoke with
7  Mr. Michael about deleting him?
8    A.   He did tell me that he did.
9    Q.   Do you know when he did that?
10    A.   He told me that he spoke with him
11  on April the 1st, 2005.
12    Q.   Did you make a note of that
13  anywhere?
14    A.   Of speaking to Joey Barnes?
15    Q.   Yes. Any handwritten notes or
16  anything like that?
17    A.   Right here.
18    Q.   You just handed me, looks like, the
19  original of the fax that we have marked as
20  Defendant's Exhibit 9?
21    A.   Yes.
22    Q.   And it has handwritten on there
23  please correct dates of endorsements of

RICE COURT REPORTING (256) 332-40

1

```
1        IN THE CIRCUIT COURT

2               FOR

3       MONTGOMERY COUNTY, ALABAMA

4

5   CANDACE M. GROSE,
    Personal Representative of the
6   Estate of Jakob A. Grose,
    Deceased,
7
        Plaintiff,
8                                   CIVIL ACTION NO.
    Vs.                             CV-2006-90085
9
    BILLY GENE MICHAEL,
10  BAD J TRUCKING COMPANY,
    et al.,
11
        Defendants.
12
            * * * * * * * * * * * *
13

14
        DEPOSITION OF JOEY BARNES, taken pursuant
15
    to stipulation and agreement before Patricia G.
16
    Starkie, Registered Diplomate Reporter, CRR, and
17
    Commissioner for the State of Alabama at Large, in
18
    the Law Offices of Rushton, Stakely, Johnston &
19
    Garrett, 184 Commerce Street, Montgomery, Alabama,
20
    on Friday, August 10, 2007, commencing at
21
    approximately 12:35 p.m.
22
            * * * * * * * * * * * *
23
```



HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

33

1    A.    Around November.

2    Q.    Of what year?

3    A.    2004.

4    Q.    Okay.  Did you, yourself, hire Billy

5         Michael?

6    A.    Yes.

7    Q.    When you hired Mr. Michael, what was he

8         supposed to do for you?

9    A.    Deliver loads.

10   Q.    Did you know him before you hired him?

11   A.    I heard of him.

12   Q.    What had you heard about him?

13   A.    That he was a pretty good driver.

14   Q.    Who did you hear that from?

15   A.    Other drivers.

16   Q.    Name one of them.

17   A.    Benny Cooksey.

18   Q.    Any others?

19   A.    No.

20   Q.    All right.  When you first got up with

21        Michael, did you contact him or did he

22        contact you?

23   A.    He contacted me.

47

1    A.    Well, I fired Billy Michael on April 1st.

2    Q.    All right.

3    A.    Canceled his insurance.

4    Q.    And how does that --

5    A.    I made a load, and I come -- coming back.

6          My cousin and I was going to get this

7          trailer and take it down to Florida.

8    Q.    Benny Cooksey?

9    A.    Yes.

10   Q.    Well, how was it that Billy Gene Michael

11         picked it up?

12                   MR. WARD:  Form.

13   A.    Don't know.  Don't --

14   Q.    Had he hauled loads for this FSR company

15         before?

16   A.    Prior to April 1st, yes.

17   Q.    Where was the load picked up from?

18   A.    I don't know.

19   Q.    Where were FSR loads usually picked up?

20   A.    From Southern Motion.

21   Q.    Did they have a freight yard there in

22         Pontotoc?

23   A.    Furniture yard.

53

1       under your agreement; is that right?

2  A.   He would not pay his insurance.

3  Q.   Okay.

4  A.   So, I mean, I let him go on April 1st.

5  Q.   All right.  Was that the basis of your

6       dispute, though, that he wouldn't pay you?

7  A.   No, sir.

8  Q.   Was it something else?

9  A.   The basis of the -- of him being fired was

10      that he would not pay his insurance, and

11      they kept on taking out of my insurance and

12      threatening to shut down my insurance

13      because of his negligence of paying.

14  Q.   So he really didn't live up to the

15      agreement that you had with him; is that

16      right?

17  A.   That's right.

18  Q.   Was that agreement in writing?

19  A.   It was verbal.

20  Q.   All right.  Were there any witnesses to

21      your agreement with Billy Michael?

22  A.   No, sir.

23  Q.   All right.  Tell me all the details about

59

1   Q.   Uh-huh (positive response), meaning yes?

2   A.   Yes.  Yes.

3   Q.   And then you see it's got the same

4        International tractor on both of them

5        that's highlighted.  You see that?

6   A.   Yes, sir.

7   Q.   Did you give that information to the

8        insurance agency?

9                  MR. WARD:  Form.

10  A.   No.

11  Q.   Well, you would have given it to them on

12       the March 28, '05 to '06 policy, you said,

13       right?

14  A.   They was all the time sending me those

15       forms out, sir.  And they always -- they

16       would lap over.

17  Q.   Do you want to change your testimony that

18       you gave that serial number to them, the

19       March '05 to March '06?

20                 MR. WARD:  Form.

21  Q.   That you gave them that number?

22  A.   Sir, I fired that man on April 1st.

23  Q.   I'll ask you about that.

62

1    of clarification, the two

2    documents that you have been

3    referring to, the dec pages,

4    are taken from the traffic

5    accident homicide report,

6    correct?

7    MR. DAVID ALLRED:  That's right.

8    MR. WARD:  Okay.

9    MR. SIMMS:  I was a little

10   confused, and it may help at

11   this point so if I have to ask

12   questions, we don't have to go

13   through all this again.  But I

14   don't recall in my notes if

15   you ever identified who owned

16   the '93 International

17   vehicle.  Does that make sense

18   to you?  I don't think you

19   asked that question.

20  Q.   Who owned the '93 tractor?

21  A.   Billy Michaels.

22  Q.   Did he have title to it?

23  A.   Yes, sir.

63

1    Q.   How do you know that?

2    A.   I guess he did.  I'm saying -- I guess he

3         does.  He was driving it.

4    Q.   Did how it come to be that you could insure

5         a tractor that you didn't hold title?

6    A.   I can insure your house and not hold title

7         to it.

8    Q.   Can you?  Okay.

9              Did you tell -- when you went in to see

10        Karen Edge --

11             Is she the agent?

12   A.   Yes, sir.

13   Q.   And did you tell her what kind of deal you

14        had cut with Billy Michael?

15   A.   That was none of her concern.

16                  MR. WARD:  Just answer his

17                  question.

18   Q.   Oh, really?  When you went in to see Karen

19        Edge to add --

20   A.   No, I didn't.

21   Q.   Okay.  When you went in to see the

22        insurance agent to add Mr. Michael to your

23        policy, what did you tell her?

64

```
 1    A.    I just told her I wanted to add this
 2          tractor onto my policy.
 3    Q.    All right.  And you gave her the serial
 4          number?
 5    A.    Yes.
 6    Q.    Okay.  You gave her the make and model
 7          number?
 8    A.    Yes.
 9    Q.    Right?
10    A.    Yes.
11    Q.    And you told her who was going to be
12          driving it?
13    A.    Yes.
14    Q.    Was Billy Michael with you?
15    A.    No.
16    Q.    How did they get information from him in
17          order to see if he was a driver that they
18          wanted to insure?
19                MR. WARD:  Form.
20    A.    He had a prior policy with them.
21    Q.    With Karen Edge?
22    A.    Yes.
23    Q.    All right.  How do you know that?
```

66

1    Q.    Okay.  You recall doing that?

2    A.    Yes.

3    Q.    Then the policy was issued to you.

4          Obviously, you wound up with some

5          declaration pages; is that right?

6    A.    Uh-huh (positive response).

7                    MR. WARD:  Yes?

8    A.    Yes, sir.

9    Q.    Was that policy in force at the time that

10         this accident happened on April 7th of

11         2005?

12   A.    No, sir.

13   Q.    How do you know that?

14   A.    I canceled his policy on April 1st.

15   Q.    All right.  Now, describe to me how you can

16         cancel Billy Michael's insurance, liability

17         insurance policy.

18   A.    Just by calling it in.

19   Q.    All right.  Who did you call?

20   A.    Karen Edge.

21   Q.    All right.  And what did you tell her?

22   A.    Wanted him taken off my policy.

23   Q.    Okay.

67

```
 1   A.   That I had fired him.

 2   Q.   Did you follow that up with a letter or

 3        anything like that?

 4   A.   Yes.

 5   Q.   You did?

 6   A.   Yes.

 7   Q.   Okay.  Where is that letter now?  Did you

 8        keep a copy?

 9   A.   I turned one over to my attorney.

10   Q.   Which attorney?

11   A.   This one.

12   Q.   Robert Ward?

13   A.   Mr. Ward.

14   Q.   Do you know of any reason why he's not

15        produced it to us?

16               MR. WARD:  Yeah, I can tell you

17                  why.  Because I can't find

18                    it.  I can't find a letter of

19                    that nature.

20               MR. DAVID ALLRED:  All right.

21               MR. WARD:  I've looked for it

22                    through my file.

23   Q.   You called Karen Edge April the 1st, right?
```

68

1   A.   Yes, sir.

2   Q.   And you told her that you had fired Billy

3         Michael; is that correct?

4   A.   Yes, sir.

5   Q.   Did you say anything else to her?

6   A.   Take him off my policy.

7   Q.   And did Ms. Edge say anything?

8   A.   Yes.

9   Q.   What did she say?

10   A.   She said okay.  It will be effective at

11         12:01 tonight.

12   Q.   Okay.

13   A.   Which would have been April 2nd.

14   Q.   And you sent this letter.  When did you

15         send that letter?

16   A.   I sent the letter on April 2nd.

17   Q.   Okay.  You retained a copy?

18   A.   Yes.

19   Q.   Was it ever faxed to Ms. Edge, or you sent

20         it U.S. mail?

21   A.   U.S. mail.

22   Q.   Did you hear anything back from Ms. Edge

23         about the liability insurance coverage

83

1   Q.   Okay.  And you don't dispute that -- when

2        you applied for a policy that something

3        happened and you just never, ever received

4        a policy.  You don't say that, do you?

5   A.   No, I got the policy.

6   Q.   Okay.  Not any dispute about that?

7   A.   No, sir.

8   Q.   Okay.  In response to number 11 -- and I

9        asked you something about this a little

10       while ago, but I want to make sure.  Your

11       answer to it says that you -- that Michael

12       worked for you from November of '04 through

13       April 1 of '05 under a lease agreement.

14       And that was never put in writing; is that

15       right?

16   A.   I had a form of writing, yes.

17   Q.   Okay.  Where is that?

18             THE WITNESS:  I also gave you a

19               copy of that also.

20   Q.   Did you give that to Mr. Ward?

21   A.   Yes, sir.

22             MR. WARD:  A copy of what?

23   Q.   When did you give it to him?

84

1          MR. WARD:  Hold on a second.  Do

2               you understand what he's

3               asking you?  Do you have an

4               agreement in writing between

5               Mr. Michael and yourself for

6               that period at issue?

7          MR. DAVID ALLRED:  Wait a minute.

8               I don't want you to take the

9               question and field it and

10               massage it and change it.

11    A.    Let me tell you what --

12    Q.    Was there any piece of paper between you

13          and Michael about him running a truck for

14          you?

15    A.    Yes, sir.

16    Q.    Where is it today?

17    A.    I have a copy of it.

18    Q.    Okay.  Did you give a copy to your lawyer?

19    A.    I believe I did.

20    Q.    When did you give it to him?

21    A.    When we had a conference.

22    Q.    Sir?

23    A.    When we had a conference.

85

1    Q.    When you had a conference?

2    A.    Yes.

3    Q.    And when was that?

4    A.    Couple months ago.

5    Q.    Were you present in Montgomery when you had

6          that conference?

7    A.    No, sir.

8    Q.    Where did that conference take place?

9    A.    Savannah, Tennessee.

10   Q.    I'm sorry.  I just didn't understand what

11         you said.

12   A.    It was in Savannah.  I believe it was

13         Savannah, Tennessee, Counce, Tennessee.

14   Q.    You met with Mr. Ward in person?

15   A.    Yes, sir.

16   Q.    What does that agreement say or that paper

17         say?

18   A.    We could never get together, him and I, to

19         sign an agreement.  But I give him a piece

20         of paper, and it says on there that by

21         applying my BAD J Trucking to his truck

22         that he agrees to this, what was stated in

23         the letter.  And then after receiving that,

86

1  he went to the people that I had my

2  lettering done by and ordered him a set of

3  letters.

4  Q.  Okay.

5  A.  And the act of applying that to his truck

6  made him agreeable.

7  Q.  Okay.  So as far as you were concerned,

8  y'all had an agreement?

9  A.  Yes.

10  Q.  Okay.  And it was agreeable with you for

11  him to put BAD J Trucking Company, Iuka,

12  Mississippi on the side of his truck?

13  A.  Yes, sir.

14  Q.  What's the name of that lettering company?

15  A.  I don't recollect right now, but I can get

16  it for you.

17  Q.  How would you get it?

18  A.  When I go home, I can go by there and tell

19  them --

20  Q.  Are they in Iuka?

21  A.  Booneville.

22  Q.  Booneville?  All right.

23  A.  Mr. Stripes is his name.

1    Q.   And I know I'm skipping some numbers, but

2         I've got some other documents marked here

3         and I'll go back to them.  I'm going to

4         mark another one 10.

5                        (Plaintiff's Exhibit 10 was marked

6                        for identification.)

7                   MR. SIMMS:  What number is this

8                   one?

9                   MR. DAVID ALLRED:  9 is the lease

10                  agreement.

11   Q.   So you've got this lease agreement here,

12        Number 9.  How did you come about having

13        that piece of paper today?

14                  MR. DAVID ALLRED:  Y'all have a

15                  copy of it over there?

16                  MR. WARD:  Yeah.  Go ahead.

17   Q.   Did you bring it with you today or is this

18        what you gave your lawyer in Tennessee or

19        what?

20   A.   Yes, that's what I gave my lawyer in

21        Tennessee.

22   Q.   All right.  So this document, Exhibit

23        Number 9, did you type that up?

1  A.   Yes, I did.

2  Q.   All right.  And it's dated November 8th of

3       '04.  When did you type it?

4  A.   That was the date that it was typed.

5  Q.   And what did you do with it?

6  A.   I filed it.

7  Q.   Filed it in Mr. Michael's file?

8  A.   No.  I filed one of them in his file and

9       sent the other one to Jerry Stutsey and one

10      to Karen Edge.

11  Q.   Sent one to Jerry Stutsey.  That's at FSR?

12  A.   FSR.

13  Q.   And you sent one to Karen Edge.  That's at

14      Transportation Insurance?

15  A.   Yes, sir.

16  Q.   All right.  Did you send one to anybody

17      else?

18  A.   No, sir.  Well, Billy Michael.

19  Q.   Sir?

20  A.   Billy Michael got one.

21  Q.   Did you send it to him?

22  A.   Yes, sir, by U.S. mail.

23  Q.   Did you send it to the address on this

111

```
 1            letter?

 2    A.     Yes, sir.

 3    Q.     Was it your intention at least on that date

 4           for him to be leased to you?

 5    A.     No.  I mean --

 6    Q.     Well, you said on here, you shall consider

 7           your truck leased to BAD J Trucking.

 8    A.     Oh, yes, sir.

 9    Q.     And you say, I have changed the wording in

10           the lease agreement so that a signature is

11           not required, but the act of applying the

12           decals of BAD J Trucking to your truck,

13           paying the required 15 percent, and getting

14           your insurance through Transportation

15           Insurance, you shall consider your truck

16           leased to BAD J Trucking.

17    A.     That's it.

18    Q.     That was your opinion at the time that you

19           wrote that letter; is that correct?

20    A.     Yes, sir.

21    Q.     And this 15 percent, I don't remember

22           that -- I thought you said you got $50.

23    A.     I did.
```

112

1    Q.    What's the 15 percent about?

2    A.    That was if he was pulling my trailer.  He

3          never did pull my trailer.

4    Q.    All right.  So if he pulled your trailer,

5          you got 15 percent of the gross freight?

6    A.    Yes.

7    Q.    Did you have any -- you say, I have to

8          change the wording in the lease agreement

9          in that second paragraph.  So what lease

10         agreement are you referring to there?

11   A.    Well, changed the wording of any lease

12         agreement that said -- basically says that

13         he has to sign it.  But since I could not

14         get up with him --

15   Q.    Let me ask you this question.  Was there

16         something called a lease agreement or

17         whatever you want to call it, a piece of

18         paper prior to this November the 8th of '04

19         letter that you were trying to get him to

20         sign, Michael to sign?

21   A.    Yes, there was, but I couldn't never get up

22         with him for him to do so.

23   Q.    Okay.  Where is that document?

1    A.    I don't know.

2    Q.    Do you have a copy?

3    A.    No, sir.

4    Q.    What did it say?

5    A.    It just said that I, and then blank, you

6          know, and his name, Billy Michael, agreed

7          to the terms of this lease agreement.

8    Q.    Okay. Do you have a blank one somewhere?

9    A.    No, sir. I got it from somebody else. I

10         forget who gave it to me, but it was their

11         lease agreement.

12   Q.    But it was never signed, you say, between

13         you and Michael; is that right --

14   A.    No, sir.

15   Q.    -- okay. And then this Exhibit 10, it says

16         lease termination. And it says reason for

17         termination, failure to keep insurance

18         paid. And that's dated April 1st of '05.

19         Did you type that up?

20   A.    Yes, sir.

21   Q.    What did you do with it?

22   A.    Well, I put it in the envelope and sent it

23         off to him.

1          MR. SIMMS:  And that was the end

2              of your exhibits for today?

3          MR. DAVID ALLRED:  Yes, 11.

4          Right.

5                  EXAMINATION

6  BY MR. SIMMS:

7  Q.   Mr. Barnes, my name is Keri Simms.  I think

8       I've been introduced to you earlier.  I

9       represent Mr. Michael.

10          I just want to be sure.  The vehicle

11       that he was operating at the time of this

12       accident, it was owned by him; is that

13       correct?

14  A.   Yes, sir.

15  Q.   Okay.  And at some point -- and it looks

16       like to me around November of '04 -- you

17       allowed him to put BAD J Trucking's logo on

18       the side of his tractor?

19  A.   Yes, sir.

20  Q.   Okay.  And then I think you testified that

21       you terminated him on April the 1st of '05;

22       is that right?

23  A.   Yes, sir.

```
 1   Q.   Okay.  And you made reference to this in
 2        here somewhere, but I didn't see it.  What
 3        did you tell him to do as far as the logo
 4        on the side of the truck?
 5   A.   I sent two individuals over to his house.
 6        Since I told him that he is fired away from
 7        his house, due to DOT regulations I have to
 8        give him 24 hours to reach his home 20,
 9        which is his home, and then to remove the
10        logo.  And since he was away from his
11        house, I -- he asked to be -- to go to his
12        house.  So I sent two people over there to
13        remove that logo.  His truck was not at his
14        house.
15   Q.   Okay.  When was that?  Approximately when
16        would that have been done?
17   A.   That would have been done on the 2nd.
18   Q.   April 2nd of '05?
19   A.   Yes.
20   Q.   Okay.
21   A.   They went back on April 3rd.
22   Q.   Okay.  Truck there?
23   A.   Truck was not there.
```

```
 1    Q.   Okay.

 2    A.   And of course, I had to leave out on a

 3         load, myself, and I wasn't around to keep

 4         them boys going back over there.

 5    Q.   Did you put anything in writing to

 6         Mr. Michael about removing the logo?

 7    A.   No, sir.

 8    Q.   And you say you would have sent him a copy

 9         of the termination; is that correct?

10    A.   Yes, sir.

11    Q.   Did you hand it to him or did you mail it

12         to him?

13    A.   Mailed it to him.

14    Q.   Did you send -- I may have just asked

15         this.  Did you send anything to him in

16         writing about removing the logo?

17    A.   No, sir.

18    Q.   Did you call him and tell him to remove it?

19    A.   I was talking to him.

20    Q.   You told him to remove it?

21    A.   Yes.

22    Q.   And that was prior to this accident?

23    A.   Yes, sir.  That was on April 1st.
```

BAD J TRUCKING
45 county road 229
IUKA, Ms.38852

Billy Michaels
county road 3011, house #1                    11/8/04
Boonsville,Ms 38829

### LEASE   AGREEMENT

Since it has be

    Since it has become very differcuit to meet with you,
because I deliver loads as you do. to decuss the possibility
of you leasing on your truck to BAD J TRUCKING,


    I have change the wording in the lease agreement,so that
a signature is not required,but the act of appling the decals
of BAD J TRUCKING,to your truck, paying the required 15% and
getting your insurence thur transportation insurence. you shall
consider your truck leased to BAD J TRUCKING.


    1. failure to keep insurance paid SHALL be reason to ter-
minate lease.
2  failure to keep appointment SHALL be reason to terminate
lease.

3  upon be terminated,your have 24 hours to surrender decals.


PLAINTIFF'S
EXHIBIT
9
Barnes 8-10-07

JOEY LUM BARNES.
OWNER OF BAD J TRUCKIN

BAD J TRUCKING
45 county road 229
Iuka Ms 38852

BILLY MICHAELS
COUNTY ROAD 3011 HOUSE # 1
BOONVILLE,MS 38829

4/1/05

LEASED TERMINATION

reason for termination,FAILURE TO KEEP INSURENCE PAID.

JOEY LUM BARNES
OWNER OF BAD J TRUCKING

Copy:  Billy Michaels
       Karen Edge
       TRANSPORTATION INSURE

       L.R.  BROKAGES
       PONTOTOC,MS



PLAINTIFF'S
EXHIBIT
10
Barnes 8-10-07