IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| CANAL INSURANCE COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| BILLY GENE MICHAEL, an individual; | ) | |
| JOEY BARNES, individually and d/b/a | ) | CIVIL ACTION NUMBER: |
| BAD J TRUCKING COMPANY; | ) | 2:07CV882-MHT |
| CANDACE M GROSE, as personal | ) | |
| representative of the Estate of JAKOB | ) | |
| A. GROSE; et al. | ) | |

## CANAL INSURANCE COMPANY'S BRIEF IN OPPOSITION TO CANDACE M. GROSE AND BILLY GENE MICHAEL'S MOTIONS FOR SUMMARY JUDGMENT

COMES the Plaintiff, Canal Insurance Company, in opposition to Candace M. Grose and Billy Gene Michael's Motions for Summary Judgment, and files this brief. Billy Gene Michael has adopted the arguments set forth in Candace M. Grose's Brief and Argument in Support of Motion for Summary Judgment, and accordingly, both motions are addressed herein.

### A.  PROCEDURAL SUMMARY

Canal Insurance Company filed this action seeking a declaration that it has no duty to defend or to indemnity Billy Gene Michael or Joey Barnes, individually and/or d/b/a Bad J Trucking Company, from claims asserted by Candace M. Grose, as personal representative of the Estate of Jakob A. Grose (hereinafter referred to as "Candace M. Grose"). Those claim arise out of an April 7, 2005 motor vehicle accident involving a tractor trailer operated by Billy Gene Michael and an automobile operated by Jakob A. Grose in or near U.S. Highway 231 in Montgomery County, Alabama. (See Complaint for Declaratory Judgment).

1

On October 10, 2006, Candace M. Grose filed a wrongful death claim in the Circuit Court of Montgomery County, Alabama against Billy Gene Michael and various fictitious defendants, bearing Civil Action Number CV-06-900085 (hereinafter referred to as "underlying lawsuit"). On November 6, 2006, the complaint in the underlying lawsuit was amended to name Billy Gene Michael; Bad J Trucking Company; Joey Barnes, an individual; Joey Barnes, d/b/a Bad J Trucking Company; and various fictitious parties as defendants. (See Complaint and First Amended Complaint in underlying lawsuit, attached as exhibits to Complaint for Declaratory Judgment).

Candace M. Grose alleged in the underlying lawsuit that on or about April 7, 2005, the defendants Billy Gene Michael, Bad J Trucking Company, Joey Barnes individually and d/b/a Bad J Trucking Company, along with the fictitious defendants, were operating an 18-wheel tractor trailer rig within Montgomery County, Alabama, on U.S. Highway 231; that the defendants negligently or wantonly caused or allowed the tractor trailer rig to pull out of a private drive, across U.S. 231 South and completely block the path of Jakob A. Grose; and that as a result, the vehicle being driven by Jakob A. Grose collided with the defendants' rig, causing injuries to Jakob A. Grose, from which he died. The First Amended Complaint in the underlying lawsuit further purports to state claims against Bad J Trucking Company, Joey Barnes individually and/or d/b/a Bad J Trucking, and various fictitious defendants, for negligent hiring, training and supervision of Billy Gene Michael; negligent entrustment of the 18-wheel tractor trailer rig to Billy Gene Michael; negligent inspection or maintenance of the tractor trailer rig being operated by Billy Gene Michael at the time of the subject accident; and vicarious liability for the acts, errors and/or omissions of Billy Gene Michael. (See Complaint and First Amended

2

Company in the underlying lawsuit, attached as exhibits to Complaint for Declaratory Judgment).

## B. INSURANCE POLICY LANGUAGE

At the time of the subject accident, Joey Barnes d/b/a Bad J Trucking had in effect a basic auto liability policy with Canal Insurance Company, policy number 395497, with a policy period of March 28, 2003, until canceled, listing Joey Barnes d/b/a Bad J Trucking as the named insured.  Under Section A - Basic Automobile Liability Insurance, the policy provides as follows:

I.  **COVERAGE A - BODILY INJURY LIABILITY - COVERAGE B - PROPERTY DAMAGE LIABILITY:**

The company will pay on behalf of the **insured** all sums which the **insured** shall become legally obligated to pay as damages because of **bodily injury** or **property damage** to which this insurance applies, caused by an **occurrence** and arising out of the ownership, maintenance or use, including loading and unloading, for the purposes stated as applicable thereto in the declaration, of an **owned automobile** or of a **temporary substitute automobile** . . .

. . .

**Exclusions:** This insurance does not apply:

. . .

(f) to bodily injury or property damage arising out of the ownership, maintenance, operation, use, loading or unloading of any owned automobile or temporary substitute automobile while such automobile is being used as a public or livery conveyance,

3

**unless such use is specifically declared and described in the declarations**. (emphasis added).

(See Exhibit "C" to Complaint for Declaratory Judgment; See Affidavit of Era E. Horner, Jr.).

The subject insurance policy is a scheduled vehicle policy, and *at one time*, listed the 1993 International tractor, which was owned by Billy Gene Michael and which he was operating at the time of the subject accident, as a covered vehicle under the policy. However, *prior to the date of the subject accident*, and more specifically, on April 2, 2005, *the 1993 International tractor had been deleted from the Canal policy pursuant to an April 2, 2005 E-3L endorsement*, and following Joey Barnes' notice to Billy Gene Michael on April 1, 2005 that his 1993 International tractor would be removed from the subject policy, and that Billy Gene Michael had twenty-four hours to remove the Bad J Trucking placards and USDOT authority from that tractor. (See Affidavit of Era E. Horner, Jr.)

## C. SUMMARY OF FACTS

Billy Gene Michael operated his 1993 International tractor, under Joey Barnes d/b/a Bad J Trucking's DOT number, pursuant to a lease agreement dated November 8, 2004, between Michael and Barnes. Although the agreement was not signed by Billy Gene Michael, it did memorialize the agreement between Michael and Barnes. A copy of the agreement was given to Billy Gene Michael. (Deposition of Joey Barnes, page 33, 62, 83-86, 109-110; Exhibit 9 to deposition of Joey Barnes). The agreement provided that by Billy Gene Michael's act of applying the decals of Bad J Trucking to his truck, paying the required fifteen percent, and getting his insurance through Transportation Insurance, he shall consider his truck leased to Bad

4

J Trucking.  (Deposition of Joey Barnes, page 111).

In November of 2004, Joey Barnes told his insurance agent, Karen Edge of Transportation Insurance Services, Inc., to add Billy Gene Michael's 1993 International tractor, VIN number 1MSRACAN3PH465116, to his insurance policy.  (Deposition of Joey Barnes, pages 63-64).  Billy Gene Michael's 1993 International tractor, VIN number 1MSRACAN3PH465116, was added to the policy on November 10, 2004.  (See Deposition of Karen Edge, pages 14-15, 19-21).

Joey Barnes terminated Billy Gene Michael on April 1, 2005 for failing to pay for his insurance, and advised him that his insurance was being cancelled as of April 2, 2005. (Deposition of Joey Barnes, page 47, 53, 59, 131-132; Deposition of Karen Edge, page 68).  Joey Barnes also forwarded a letter to Billy Gene Michael on April 1, 2005, confirming that his lease was terminated for failure to keep his insurance paid.  (Deposition of Joey Barnes page 113, 133).

On April 1, 2005, Joey Barnes called his insurance agent, Karen Edge of Transportation Insurance Services, Inc., and told her to take Billy Gene Michael's tractor off his policy because he had been terminated.  (Deposition of Joey Barnes, page 66-68; Deposition of Karen Edge, pages 40, 44).  Karen Edge told Joey Barnes that Billy Gene Michael's tractor would be removed from the policy effective April 2, 2005 at 12:01 a.m.  (Deposition of Joey Barnes, page 68).  Joey Barnes sent a letter to Karen Edge on April 2, 2005 confirming that Billy Gene Michael's tractor had been removed from his policy of insurance.  (Deposition of Joey Barnes, page 68).

Karen Edge spoke with Billy Gene Michael on April 1, 2005, and Ms. Edge told Billy Gene Michael that his unit was being deleted by Joey Barnes.  (See Deposition of Karen Edge, pages 40, 44).

Prior to April 2, 2005, a 1993 International tractor, vehicle identification number 1MSRACAN3PH465116 (hereinafter "the 1993 International") had been listed as a covered vehicle under the subject Canal policy. On April 1, 2005, Horner Insurance Services, Inc. (hereinafter "Horner"), acting as general agent for Canal Insurance Company, received a request via facsimile from Transportation Insurance Services, Inc. (hereinafter "Transportation Insurance"), the agent of the named insured, Joey Barnes d/b/a Bad J Trucking, to delete the 1993 International from coverage, effective April 2, 2005 at 12:01 a.m. (See Affidavit of Era E. Horner, Jr.)

In response to this request, Horner issued a Change of Vehicle Endorsement terminating coverage of the 1993 International. A clerical error was made in the effective date and times of this endorsement; instead of making the endorsement effective April 2, 2005 at 12:10 a.m. as requested, the endorsement was made effective April 1, 2005 at 1:56 p.m., the time and date that the request was processed. (See Affidavit of Era E. Horner, Jr.)

On April 11, 2005, Horner received a follow-up request from Transportation Insurance, via fax, requesting that Horner correct the effective date on the endorsement. In response to this request, Horner issued two additional Change of Vehicle Endorsements. One endorsement added the 1993 International back to the subject Canal policy, effective April 1, 2005 at 1:56 p.m. Simultaneously, Horner issued a Change of Vehicle Endorsement excluding the 1993 International from coverage effective April 2, 2005 at 12:01 a.m. The combined effect of these two endorsements was correct the clerical error of the effective date of termination of coverage, for the 1993 International, extending coverage to April 2, 2005 at 12:01 a.m. **There was no coverage for the 1993 International under the subject Canal policy after April 2, 2005 at**

6

**12:01 a.m.** (See Affidavit of Era E. Horner, Jr; See deposition of Karen Edge, page 37, 40.)

After Billy Gene Michael was notified that his lease agreement with Bad J Trucking was being terminated as of April 1, 2005 due to his failure to pay insurance premiums, and after Billy Gene Michael was notified by Joey Barnes and Karen Edge that his 1993 International tractor was being deleted from Joey Barnes d/b/a Bad J Trucking's insurance policy effective April 2, 2005, Billy Gene Michael was involved in the April 7, 2005 motor vehicle accident made the basis of the underlying lawsuit. (See Affidavit of Era E. Horner, Jr.; See Deposition of Karen Edge pages 40-44; See Deposition of Joey Barnes, pages 47, 53, 59, 131-132; See Complaint for Declaratory Judgment).

## ARGUMENT

The Motions for Summary Judgment filed on behalf of Candace M. Grose and Billy Gene Michael (hereinafter "Grose/Michael") are due to be denied pursuant to Rule 56 of the Federal Rules of Civil Procedure. There is no admissible evidence to support the position set forth by Grose/Michael in their Motions for Summary Judgment, and they are not entitled to judgment as a matter of law.

In support of their Motions for Summary Judgment, Grose/Michael rely on three separate arguments:

1.   Grose/Michael allege that the deposition of Karen Edge, the producing agent for Canal, demonstrates that Michael's tractor was at one time listed as an insured unit on the suit policy declaration page;

2.   Grose/Michael allege that the deposition testimony of Billy Gene Michael, taken in the underlying case in which Canal is not a party, demonstrates that he was an

7

employee of Barnes and was operating under Barnes' DOT authority, and in fact,

had a lease with Barnes at the time of the subject collision.

3.      Grose/Michael allege that there is an absence of evidence that from Canal (the non-

moving party) that Canal is entitled to avoid coverage despite the MCS-90

endorsement to the subject policy.

Each of the above arguments is addressed below.


I.      **WHILE THE DEPOSITION TESTIMONY OF KAREN EDGE, JOEY BARNES' INSURANCE AGENT, DOES DEMONSTRATE THAT AT ONE TIME MICHAEL'S TRACTOR WAS LISTED AS AN INSURED UNIT UNDER THE SUBJECT POLICY, HER TESTIMONY ALSO DEMONSTRATES THAT MICHAEL'S UNIT WAS REMOVED FROM THE POLICY, AT THE REQUEST OF THE NAMED INSURED, PRIOR TO THE DATE OF THE SUBJECT ACCIDENT.**

While the deposition testimony of Karen Edge, Joey Barnes' insurance agent, does

demonstrate that at one time Billy Gene Michael's tractor was listed as an insured unit under the

subject policy, her testimony also demonstrates that Michael's unit was removed from the policy,

at the request of the named insured, prior to the date of the subject accident.

As outlined above, on April 1, 2005, Joey Barnes, the named insured, called his insurance

agent, Karen Edge of Transportation Insurance Services, Inc., and told her to take Billy Gene

Michael's tractor off his policy because he had been terminated.  (Deposition of Joey Barnes, page

66-68; Deposition of Karen Edge, pages 40, 44).  Karen Edge told Joey Barnes that Billy Gene

Michael's tractor would be removed from the policy effective April 2, 2005 at 12:01 a.m.

(Deposition of Joey Barnes, page 68).  Joey Barnes sent a letter to Karen Edge on April 2, 2005

confirming that Billy Gene Michael's tractor had been removed from his policy of insurance.

(Deposition of Joey Barnes, page 68).

Karen Edge spoke with Billy Gene Michael on April 1, 2005, and Ms. Edge told Billy Gene Michael that his unit was being deleted by Joey Barnes.   (See Deposition of Karen Edge, pages 40, 44).

Accordingly, while Grose/Michael's brief is correct with regard to the fact Billy Gene Michael's 1993 International tractor was at one time listed on the subject policy, it fails to mention the remaining testimony by Karen Edge that the tractor was deleted by the named insured prior to the date of the subject accident.

## II.    **THE DEPOSITION TESTIMONY OF BILLY GENE MICHAEL, RELIED UPON BY GROSE/MICHAEL , IS DUE TO BE STRICKEN.**

Canal Insurance Company has filed a Motion to Strike the testimony of Billy Gene Michael, which has been relied upon by Grose/Michael in support of their Motions for Summary Judgment. (See Canal Insurance Company's Motion to Strike).

Rule 12(f) of the Federal Rules of Civil Procedure provides that upon a party's motion, or the Court's own initiative, the Court may strike from any pleading any insufficient defense or any redundant, immaterial, impertinent or scandalous matter. F.R.C.P. 12(f).   Canal Insurance Company ("Canal") requests that this Court strike the deposition testimony of Billy Gene Michael which has been relied upon by Grose/Michael in opposition to Canal's  Motion for Summary Judgment, and also in support of their own Motions for Summary Judgment. The testimony of Billy Gene Michael ("Michael") was taken in a separate proceeding in which Canal is not a party and, therefore, had no opportunity for cross-examination.

Rule 32of the Federal Rules of Civil Procedure, amended December 1, 2007, provides in pertinent part as follows:

**Rule 32. Using Deposition.**

**(a) Using Depositions.**

> **(1) In General.**  At a hearing or trial, all or part of a deposition may be used against a party on these conditions:
>
> > **(A) the party was present or represented at the taking of the deposition** or had reasonable notice of it;
> >
> > . . .
>
> **(8) Depositions Taken in an Earlier Action**.  A deposition taken and, if required, filed in any federal - or state - court action may be used in a later action involving the **same subject matter between the same parties**, or their representatives or successors in interest, to the same extent as if taken in the later action.
> F.R.C.P. 32 (as amended, December 1, 2007) (emphasis supplied).

It is clear from a reading of Rule 32(a) of the Federal Rules of Civil Procedure that a deposition taken in an earlier action may only be used against a party in the present proceeding if (1) the party against whom the deposition is offered was present or represented at the taking of the deposition; and (2) the prior action and present action involve the same subject matter and the same parties.  Stated another way, depositions are generally allowed in consideration of a motion for summary judgment provided that the party against whom they are admitted was present or represented at the deposition. *The Nippon Credit Bank Ltd. v. Matthews*, 291 F.3d 738, 751 (11th Cir. 2002).

Furthermore, Federal Rule of Evidence 804(b)(1) provides as follows:

**Rule 804.  Hearsay Exceptions; Declarant Unavailable.**
. . .

10

**(b) Hearsay exceptions.** The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

> **(1) Former testimony.** Testimony given as a witness at another hearing of the same or different proceeding, or in a deposition taken in compliance with the law in the course of the same or another proceeding, **if the party against whom the testimony is now offered**, or in a civil action or proceeding, a predecessor in interest, **had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination**.
> F.R.E. 804(b)(1) (emphasis supplied).

Accordingly, depositions taken in a different proceeding may not be considered in support of a motion for summary judgment against a party who was not offered the opportunity to cross-examine the deponent. *The Nippon Credit Bank Ltd. v. Matthews*, 291 F.3d 738, 751 (11ᵗʰ Cir. 2002).

The testimony of Michael, which is relied upon by Grose/Michael in opposition to Canal's Motion for Summary Judgment and in support of their own Motions for Summary Judgment, was taken in a separate action (Candace M. Grose v. Billy Gene Michael, in the Circuit Court for Montgomery County, Alabama, Civil Action Number CV-06-900085), in which Canal is not a party, and therefore, had no opportunity to cross-examine Michael during his deposition. Accordingly, pursuant to Rule 32(a) of the Federal Rules of Civil Procedure, Rule 804 of the Federal Rules of Evidence, and the federal case law cited herein, Michael's testimony offered against Canal is due to be stricken by this Court.

Grose/Michael improperly rely upon the deposition testimony of Billy Gene Michael, given in the underlying case, to support the contention that "Billy Gene Michael . . . was an employee of Defendant Barnes and was operating under Barnes DOT authority and, in fact, had a lease with Barnes at the time of the collision in which Jakob Grose was killed. (See Candace M.

Grose's Memorandum Brief and Argument in Support of Motion for Summary Judgment, page 7,

citing pages from the deposition transcript of Billy Gene Michael taken in the underlying case, in

which Canal Insurance Company is not a party.)  Grose/Michael's argument in this regard is based

entirely on the *inadmissible* testimony of Billy Gene Michael given in the underlying lawsuit.

The *admissible* evidence in this case, as outlined above, indicates that at the time of the

subject accident, Billy Gene Michael was **not** operating under a lease agreement with Barnes, was

**not** an employee of Barnes, and was **not** operating under Barnes' DOT authority.  Accordingly,

Grose/Michael's argument that the MCS-90 endorsement to the subject insurance policy creates

an obligation on the part of Canal Insurance Company to defend and/or indemnify in the

underlying case is completely without merit, and the *admissible* evidence in this case certainly

does not entitle either Grose or Michael to judgment as a matter of law.

III    **GROSE/MICHAEL'S ARGUMENT THAT THERE IS AN ABSENCE OF EVIDENCE THAT CANAL HAS NO INDEMNITY OR DEFENSE OBLIGATIONS UNDER THE SUBJECT POLICY IS NOT SUPPORTED BY THE ADMISSIBLE FACTS IN THIS CASE.**

Grose/Michael's argument that there is an absence of evidence that Canal has no

indemnity or defense obligations under the subject policy is not supported by the admissible facts

in this case.  (Additionally, Canal requests the Court to take notice that the statement contained on

Page 2 of Candace M. Grose's Brief and Argument in Support of Motion for Summary Judgment

that "Canal acknowledges that Billy Gene Michael was operating a tractor trailer rig under the

DOT authority of Defendant Joey Barnes d/b/a Bad J Trucking" is misleading because Canal has

clearly stated its position that at the time of the accident Billy Gene Michael was **not** operating a

tractor trailer rig under Barnes' DOT authority.)

Quite simply, on April 1, 2005, six day prior to the accident made the basis of the underlying lawsuit, the lease agreement between Billy Gene Michael and Joey Barnes d/b/a Bad J Trucking was terminated. Joey Barnes testified that he told Billy Gene Michael on April 1, 2005 that his lease agreement was being terminated as of that date due to Billy Gene Michael's failure to pay his insurance premiums, and Joey Barnes confirmed that termination by correspondence to Billy Gene Michael dated April 1, 2005. Therefore, as of April 7, 2005, the date of the subject accident, Billy Gene Michael was not operating under a lease agreement with Joey Barnes d/b/a Bad J Trucking.

When a carrier has made reasonable attempts to terminate such a lease agreement prior to an accident giving rise to a claim, the insurer has no indemnity obligations pursuant to the policy. See Graham v. Malone Freight Lines, 314 F.3d 7, 14-15 (1st Cir. 1999) (carrier's letter to driver advising of lease termination is sufficient and reasonable); Canal Insurance Company v. Jackson, 101 F.3d 1083 (5th Cir. 1996) (holding that Canal had no indemnity obligations when the lease agreement had been terminated prior to the accident, even when the carrier's placards have not been removed at the time of the accident and the carrier has received no acknowledgment of termination). Joey Barnes' actions to terminate the lease with Billy Gene Michael were more than reasonable and served as an effective termination of the lease agreement prior to the date of the subject accident. Accordingly, Canal Insurance Company has no indemnity obligations with regard to the claims made the basis of the underlying lawsuit.

Additionally, on April 1, 2005, six days prior to the accident made the basis of the underlying lawsuit, Joey Barnes contacted his insurance agent, Karen Edge of Transportation Insurance Services, Inc., and notified her that Billy Gene Michael had been terminated on that

13

date and instructed her to remove Billy Gene Michael's 1993 International tractor from his policy of insurance with Canal. Karen Edge confirmed to Joey Barnes on that date that Billy Gene Michael would be removed from Joey Barnes d/b/a Bad J Trucking's policy of insurance as of April 2, 2005 at 12:01 a.m. Karen Edge notified Horner Insurance Services, Inc., general agent of Canal Insurance Company, of the need to remove Billy Gene Michael's 1993 International tractor from Joey Barnes d/b/a Bad J Trucking insurance policy effective April 2, 2005 at 12:01 a.m., and same was accomplished by an endorsement to the policy. Accordingly, on April 2, 2005 at 12:01 a.m., Billy Gene Michael's 1993 International tractor was deleted from Joey Barnes d/b/a Bad J Trucking's policy of insurance with Canal Insurance Company.

Also, on April 1, 2005, Joey Barnes contacted Karen Edge of Transportation Insurance Services, Inc., and Karen Edge told Joey Barnes at that time that his 1993 International tractor would be deleted from Joey Barnes d/b/a Bad J Trucking's insurance policy as of April 2, 2005 at 12:01 a.m.

Accordingly, there does exist admissible evidence that at the time of the subject accident, Billy Gene Michael was **not** operating under any type of lease agreement with Joey Barnes d/b/a Bad J Trucking, and that Billy Gene Michael's 1993 International tractor had been deleted from the subject Canal policy some five days prior to the accident. Furthermore, Billy Gene Michael was aware of both his lease termination and the fact that he was no longer listed on the Canal policy prior to the date of the subject accident.

14

## CONCLUSION

For the reasons stated above, the Motion for Summary Judgment filed on behalf of

Candace M. Grose is due to be denied.

_____
Jack J. Hall, Attorney for Plaintiff,
Canal Insurance Company

**OF COUNSEL:**
HALL, CONERLY & BOLVIG, P.C.
505 N. 20th Street, Suite 1400
Birmingham, AL 35203
(205) 251-8143
fax: (205) 326-3202

## CERTIFICATE OF SERVICE

I do hereby certify that I have on this 28th day of February, 2008, served a true and correct copy of the above pleading on all counsel of record by placing same in the United States Mail, postage prepaid and properly addressed to:

William E. Brittain
Ball, Ball, Matthews & Novak, P.A.
P.O. Box 2148
Montgomery, AL 36102
ebrittain@ball-ball.com

David E. Allred
DAVID E. ALLRED, P.C.
P.O. Box 241594
Montgomery, AL 36124
dallred@allredpclaw.com

Joey Barnes, an individual
and d/b/a Bad J Trucking
P.O. Box 575
Booneville, MS 38829

_____
OF COUNSEL

15

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

CANAL INSURANCE COMPANY,                    )
                                            )
    Plaintiff,                             )
                                            )
vs.                                         )       2:07-CV-882-MHT
                                            )
BILLY GENE MICHAEL, an individual;          )
JOEY BARNES, individually and d/b/a         )
BAD J TRUCKING COMPANY;                     )
CANDACE M. GROSE, as personal               )
representative of the Estate of             )
JAKOB A. GROSE; et al.                      )

## AFFIDAVIT

Before me the undersigned notary public, in and for County and State, came and appeared

Era E. Horner, Jr., who upon oath deposes and says as follows:

    1)    My name is Era E. Horner, Jr. I am employed by Horner Insurance Services, Inc.

in Memphis, Tennessee. I am over the age of 21, of sound mind and have personal knowledge of

the facts and matters stated in this Affidavit.

    2)    Horner Insurance Services, Inc. is a general insurance agency located in Memphis,

Tennessee.

    3)    Horner Insurance Services, Inc acted as a general agent for Canal Insurance

Company in the placing of certain liability insurance coverage for Joey Barnes, d/b/a Bad J

Trucking with Canal Insurance Company.

    4)    Transportation Insurance Services, Inc. was also involved in placement of this

coverage and functioned as a producing agent for Joey Barnes d/b/a Bad J. Trucking.

    5)    Canal Insurance Company issued a Basic Automobile Liability Policy to Joey Barnes

d/b/a Bad J Trucking, as the named insured, policy umber 395497, with coverage beginning March

28, 2003 and effective until canceled (hereinafter "The Policy"). Prior to April 2, 2005, a 1993

1



International tractor, vehicle identification number 1MSRACAN3PH465116 (hereinafter "The 1993 International") had been listed as a covered vehicle under The Policy.

6)    On April 1, 2005, Horner Insurance Services, Inc received a request via facsimile from Transportation Insurance Services, Inc., the agent of the named insured, to delete The 1993 International from coverage, effective April 2, 2005 at 12:01 am. A copy of that request is attached as Exhibit "A."

7)    In response to this request, Horner Insurance Services, Inc. issued a Change Of Vehicle Endorsement terminating coverage of The 1993 International , a copy of which is attached hereto as Exhibit "B." A clerical error was made in the effective date and time of this Endorsement. Instead of making it effective April 2, 2005 at 12:01 am, as requested, the Endorsement (Exhibit "B") was made effective April 1, 2005 at 1:56 p.m., the time and date that the request was processed.

8)    On April 11, 2005, we received a follow up request from Transportation Insurance Services, Inc. via fax requesting that we correct the effective date on the Endorsement (Exhibit "B"). A copy of that request this attached hereto as Exhibit "C."

9)    In response to this request, we issued two additional Change Of Vehicle Endorsements. One Endorsement added The 1993 International back to The Policy, effective April 1, 2005 at 1:56 p.m. That Endorsement is attached hereto as Exhibit "D." Simultaneously, we also issued a Change Of Vehicle Endorsement excluding The 1993 International from coverage effective April 2, 2005 at 12:01 am. A copy of that Endorsement is attached as Exhibit "E." The combined effect of these two Endorsements was to correct the clerical error of the effective date of termination of coverage, for The 1993 International, extending coverage to April 2, 2005 at 12:01 am.

10)    There was no coverage for The 1993 International in The Policy after April 2, 2005 at 12:01 am.

2

Done this 8th of February, 2008.



_____
Era E. Horner, Jr.

_____
Notary Public

My commission ends: _____ My Commission Expires November 9, 2011

BETTY J. BLASDEL
NOTARY PUBLIC
AT LARGE
SHELBY COUNTY TN

_____

3

APR-01-05 FRI 02:00 PM  TRANSPORTATION INSURANCE   FAX NO. 662/201163              P. 01/01

## Transportation Insurance Services, Inc.
### P.O. Box 328
### Booneville, MS 38829
### Phone: 662-720-1150
### Fax: 662-720-1163

---

A Fax From 'Faye Tackett'            1 Page

---

# 4/1/2005

To: Horner Insurance Services, Inc
Attn: Endorsement Dept.

Re: Bad J Trucking        395497, MTC330292, A370579

Please delete the following leased unit and driver from above
named policies effective 12:01AM, 4/2/05.

1993 International # 1MSRACAN3PH465116

Billy Michael

Thank you,

Faye



141152965

# Change of Vehicle Endorsement - Liability

It is agreed that policy to which this endorsement is attached is amended
(1) to EXCLUDE coverage on the following described vehicles(s).

| Vehicle # | Year/Trade Name/Model/Body Type | Motor Vehicle Identification # | Annual Premium |
|---|---|---|---|
| 5 | 1993 INTERNATIONAL TRACTOR * LEASE TERMINATED | 1MSRACAN3PH465118 | -6,021.00 |

(2) to INCLUDE coverage on the following described vehicle(s).

| Vehicle # | Year/Trade Name/Model/Body Type | Radius (miles) | Garage Location | Annual Premium |
|---|---|---|---|---|
| | | | | |

PK-1

ADDITIONAL PREMIUM: _____     RETURN PREMIUM:  __SEE BELOW__

4/1/2005 - 5/1/2005 Breakdown for policies under installment premium payment plan:
XXXXXXXXXXXXX    -502.00                ESCROW DEPOSIT    -1,004.00
The remaining   monthly   installments due will change by  -502.00   from   1,004.00
to     502.00            beginning with the installment due    5/1/2005

Policy Number   395497   Endorsement Effective Time XXXXXX  1:55 PM   Endorsement Effective Date  04/01/2005

Insured   JOEY BARNES DBA BAD J TRUCKING                        Expiration Date  Until Cancelled

Issue Date   04/04/2005 Authorized Signature _____

HORNER INSURANCE SERVICES, INC

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED

# Canal Insurance Company

Greenville, South Carolina

Form E-3L                                                              (Rev. 4-1994)



EXHIBIT

B

4105245107

APR-11-05 MON 03:23 PM   TRANSPORTATION INSURANCE   FAX NO. 662 201163   P. 01/01

## Transportation Insurance Services, Inc.
### P.O. Box 328
### Booneville, MS 38829
### Phone: 662-720-1150
### Fax: 662-720-1163

A Fax From 'Faye Tackett'          1 Page

## 4/1/2005

To: Horner Insurance Services, Inc
Attn: Endorsement Dept.

Re: Bad J Trucking          395497, MTC330292, A370579

Please delete the following leased unit and driver from above
named policies effective 12:01AM, 4/2/05.

1993 International # 1MSRACAN3PH465116

Billy Michael

*[handwritten]* 4-11-05
Please correct dates
on endorsement to
4-2-05 instead of
4-1-05.
On above policies.
Thanks

Thank you,

Faye

EXHIBIT
C

04/11/2005 MON 15:18 [TX/RX NO 8540] ☑001

14125723

# Change of Vehicle Endorsement - Liability

It is agreed that policy to which this endorsement is attached is amended
(1) to EXCLUDE coverage on the following described vehicle(s).

| Vehicle # | Year/ Trade Name/ Model/ Body Type | Motor Vehicle Identification # | Annual Premium |
|---|---|---|---|
| | | | |

(2) to INCLUDE coverage on the following described vehicle(s).

| Vehicle # | Year/Trade Name/Model/Body Type | Radius (miles) | Garage Location | Annual Premium |
|---|---|---|---|---|
| 5 | 1993 INTERNATIONAL  TRACTOR - LEASE TERMINATED   1MSRACAN3PH465116 | UNL | IUKA, MS | 6,021.00 |

PR 1

ADDITIONAL PREMIUM:  **SEE BELOW**          RETURN PREMIUM: _____

4/1/2005 - 5/1/2005 Breakdown for policies under installment premium payment plan:
~~XXXXXXXXXXX~~    502.00                         ESCROW DEPOSIT      1,004.00
The remaining   monthly    installments due will change by   502.00         from   502.00
to      1,004.00         beginning with the installment due    5/1/2005

Policy Number   395497        Endorsement Effective Time X~~XXXXX~~  1:56 PM     Endorsement Effective Date   04/01/2005

Insured   JOEY BARNES DBA BAD J TRUCKING

Issue Date   04/15/2005  Authorized Signature                              Expiration Date   Until Cancelled

HORNER INSURANCE SERVICES, INC

## ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED
# Canal Insurance Company
Greenville, South Carolina

Form E-3L



EXHIBIT
D
(Rev. 4-1994)

4106247370

141257240

# Change of Vehicle Endorsement - Liability

It is agreed that policy to which this endorsement is attached is amended
(1) to EXCLUDE coverage on the following described vehicle(s).

| Vehicle # | Year/Trade Name/Model/ Body Type | Motor Vehicle Identification # | Annual Premium |
|---|---|---|---|
| 5 | 1993 INTERNATIONAL  TRACTOR " LEASE TERMINATED | 1MSPACAN3PH485116 | -5,021.00 |

(2) to INCLUDE coverage on the following described vehicle(s).

| Vehicle # | Year/Trade Name/Model/Body Type | Radius (miles) | Garage Location | Annual Premium |
|---|---|---|---|---|
| | | | | |

PR 1

ADDITIONAL PREMIUM: _____    RETURN PREMIUM:  SEE BELOW

4/2/2005 – 5/1/2005 Breakdown for policies under installment premium payment plan:
XXXXXXXXXXXXX   -495.00        ESCROW  DEPOSIT    -1,004.00
The remaining  monthly   installments due will change by  -502.00   from  1,004.00
to    502.00             beginning with the installment due    5/1/2005

Policy Number  395497    Endorsement Effective Time 12:01 AM    Endorsement Effective Date 04/02/2005

Insured  JOEY BARNES DBA BAD J TRUCKING    Expiration Date  Until Cancelled

Issue Date  04/15/2005 Authorized Signature

HORNER INSURANCE SERVICES, INC

**ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED**

## Canal Insurance Company

Greenville, South Carolina

Form E-8L    (Rev. 4-1994)

4105247370

EXHIBIT

E

**1**

```
1              IN THE CIRCUIT COURT
2                     FOR
3        MONTGOMERY COUNTY, ALABAMA
4
5    CANDACE M. GROSE
6
7    VS.
8
9    BILLY GENE MICHAEL, ET AL
10
11           CV-06-900085
12
13      *  *  *  *  *  *  *  *
14          IT IS STIPULATED AND AGREED, by and
15    between the parties through their
16    respective counsel, that the deposition of
17    KAREN EDGE may be taken before Robert E.
18    Rice, Commissioner, and Notary Public,
19    State at Large, at Booneville, Mississippi,
20    on December 6, 2007, beginning at
21    10:15 a.m.
22
23
```

RICE COURT REPORTING (256) 332-4074

**2**

```
1            S T I P U L A T I O N S
2       IT IS FURTHER STIPULATED AND AGREED that
3    the signature to and reading of the
4    deposition by the witness is waived, the
5    deposition to have the same force and
6    effect as if full compliance had been had
7    with all laws and rules of Court relating
8    to the taking of depositions,
9       IT IS FURTHER STIPULATED AND AGREED that
10    it shall not be necessary for any
11    objections to be made by counsel to any
12    questions, except as to form or leading
13    questions, and that counsel for the parties
14    may make objections and assign grounds at
15    the time of the trial, or at the time said
16    deposition is offered in evidence, or prior
17    thereto.
18       IT IS FURTHER STIPULATED AND AGREED that
19    notice of filing of the deposition by the
20    Commissioner is waived.
21
22
23
```

RICE ... 56) 332-4074

**3**

```
1              A P P E A R A N C E S
2
3    FOR THE PLAINTIFF:
4
5      Mr. David E. Allred
       Attorney at Law
6      P.O. Box 241594
       Montgomery, Alabama 36124-1594
7
8    FOR THE DEFENDANT:
9
10
       Mr. James M. Strong
11     Attorney at Law
       Miller, Hamilton, Snider & Odom
12     505 20th Street North
       Suite 500
13     Birmingham, Alabama 35203
14     BY TELEPHONE:
       Mr. T. Kent Garrett
15     Attorney at Law
       Rushton, Stakely, Johnston & Garrett
16     P.O. Box 270
       Montgomery, Alabama 36101-0270
17
18
19
20
21
22
23
```

RICE COURT REPORTING (256) 332-4074

**4**

```
1                 I N D E X
2    EXAMINATION BY MR. STRONG:   6 - 73
3    EXAMINATION BY MR. ALLRED:  73 - 125
4
5
6
7              E X H I B I T   L I S T
8
9    DEFENDANT'S EXHIBIT    1    8
10   DEFENDANT'S EXHIBIT    2   21
11   DEFENDANT'S EXHIBIT    3   18
12   DEFENDANT'S EXHIBIT    4   25
13   DEFENDANT'S EXHIBIT    5   27
14   DEFENDANT'S EXHIBIT    6   28
15   DEFENDANT'S EXHIBIT    7   28
16   DEFENDANT'S EXHIBIT    8   33
17   DEFENDANT'S EXHIBIT    9   53
18   DEFENDANT'S EXHIBIT   10   53
19   DEFENDANT'S EXHIBIT   11   54
20   DEFENDANT'S EXHIBIT   12   55
21   DEFENDANT'S EXHIBIT   13   56
22   DEFENDANT'S EXHIBIT   14   56
23   DEFENDANT'S EXHIBIT   15   59
```

RICE COURT REPORTING (256) 332-4074

**13**

1 about today, did it come through Horner?
2     A.   Yes.
3     Q.   About how much of your business
4 percentage-wise, if you know, is written
5 under Canal policies?
6     A.   Of the commercial business I'm
7 going to say seventy-five percent.
8     Q.   And is Canal only written on a
9 commercial basis?
10     A.   Yes.
11     Q.   So you also write residential
12 insurance as well?
13     A.   Yes.
14     Q.   You do both homeowners, auto?
15     A.   Yes.
16     Q.   Okay, and how much of that
17 seventy-five percent of commercial
18 insurance through Canal comes through
19 Horner? Do you have an estimate?
20     A.   I don't really have an estimate.
21 It's probably a hundred thousand dollars
22 worth a month.
23     Q.   How much commercial do you write a
     RICE COURT REPORTING (256) 332-4074

**14**

1 month on average? Do you know?
2     A.   I'm going to say probably four
3 hundred thousand.
4     Q.   So that looks like it would be
5 about a quarter of your commercial would be
6 Canal if you write four hundred thousand?
7     A.   Well, more than that would be Canal
8 because I write Canal through different
9 GA's.
10     Q.   Oh, okay. You're talking only
11 through Horner?
12     A.   Canal is territorial.
13     Q.   Okay, so the hundred thousand a
14 month comes from Horner?
15     A.   Yes.
16     Q.   And then the other three hundred
17 thousand comes through?
18     A.   Other Canal GA's.
19     Q.   Other Canal GA's, okay. I'm going
20 to get right into it. The policy we're
21 here about today was a policy issued to Bad
22 J Trucking. Is that correct?
23     A.   That's correct, yes.
     RICE COURT REPORTING (256) 332-4074

**15**

1     Q.   Do you have the policy number in
2 front of you?
3     A.   Yes.
4     Q.   Can you tell us what that is?
5     A.   The policy number is 395497.
6     Q.   And exactly what kind of policy was
7 issued to Bad J Trucking?
8     A.   This is an auto liability policy.
9     Q.   Is it a commercial policy?
10     A.   Yes.
11     Q.   Do you know when the date was that
12 this policy was issued to Bad J Trucking?
13     A.   The original policy, I believe, was
14 issued in 2003.
15     Q.   Do you have a month?
16     A.   It would have probably been March,
17 March the 28th.
18     Q.   And why do you say that?
19     A.   Because that's the anniversary date
20 of all the policies that have been renewed.
21     Q.   Okay. Between March 28th, 2003 and
22 March 28th, 2005, was the policy for Bad J
23 Trucking ever cancelled for any reason?
     RICE COURT REPORTING (256) 332-4074

**16**

1     A.   It has been put into cancellation
2 for nonpayment of premium and then
3 reinstated once premium was received.
4     Q.   Do you know how many times it was
5 put into cancellation in that two year
6 period?
7     A.   Not exactly. I'm going to say two
8 times at least.
9     Q.   And when Bad J Trucking would be
10 put on notice for that cancellation, how
11 would you do that? In what manner would
12 you notify them?
13     A.   Well, we would send a request to
14 the insurance company or the general agent,
15 which would be Horner Insurance Services,
16 to cancel for nonpayment, and then they
17 would issue the cancellation notice and
18 forward a copy of it to Canal and to my
19 agency.
20     Q.   Would that be in writing?
21     A.   Yes.
22     Q.   Would Bad J Trucking or one of its
23 agents or its principal receive a copy of
     RICE COURT REPORTING (256) 332-4074

17

1  that cancellation notice?

2  A. Yes.

3  Q. And who would send that copy of the

4  cancellation notice?

5  A. Canal Insurance Company or Horner

6  Insurance Services. I'm not sure which one

7  sends the cancellation notice to the

8  insured.

9  Q. But it wouldn't come through you?

10  A. It would not come through my

11  agency, no.

12  Q. Do you ever receive a copy of that

13  cancellation notice?

14  A. Yes.

15  Q. Do you have a copy of one of those

16  in your file?

17  A. Yes.

18  Q. This is a notice of cancellation.

19  It looks like it's dated -- this is after

20  the date I had asked for.

21  A. Well, this is when the policy was

22  actually cancelled.

23  Q. Okay, I'm just looking for one that

RICE COURT REPORTING (256) 332-4074

18

1  may have been sent to them in between March

2  of 2003 and March of 2005. I'm looking at

3  one that is dated cancellation will take

4  effect July 13th of 2004, and it lists

5  Canal Insurance Company as the insurance

6  company and Horner Insurance Services of

7  Memphis, Tennessee as the general agent,

8  and it says that there were notices sent to

9  Joey Barnes d/b/a Bad J Trucking, Horner

10  Insurance Services Inc., and Transportation

11  Insurance Services. Did I read that

12  correctly, Ms. Edge?

13  A. Yes.

14  Q. This is your original, right?

15  A. Yes.

16  Q. I would like to mark this as

17  Defendant's Exhibit 3. I haven't marked 2

18  yet. Can we mark this and then make a copy

19  of it? Would that be okay for you?

20

21  (WHEREUPON, Defendant's Exhibit 3

22  was marked for identification.)

23

RICE COURT REPORTING (256) 332-4074

19

1  A. Yes.

2  Q. Okay, so this shows, and correct me

3  if I'm wrong, that Joey Barnes d/b/a Bad J

4  Trucking was notified in writing of the

5  cancellation of their policy?

6  A. Yes.

7  Q. On July 13th, 2004?

8  A. Yes.

9  Q. Okay, and to the best of your

10  knowledge this policy was reinstated some

11  time after receipt of this?

12  A. Yes.

13  Q. In case you weren't aware, the

14  reason this lawsuit was filed is that there

15  was a car accident that was involved

16  between a Jakob Grose and Billy Michael,

17  who we're alleging was operating underneath

18  Bad J Trucking's DOT information on April

19  7th, 2005.

20  A. Yes.

21  Q. At the time of that accident was

22  the Bad J Trucking policy number 395497 in

23  effect?

RICE COURT REPORTING (256) 332-4074

20

1  A. Yes.

2  Q. Now, my client, Billy Michael, was

3  he at any point in time listed on the

4  insurance policy as a covered vehicle?

5  A. Yes.

6  Q. Okay, and was Mr. Michael's name

7  ever on the policy?

8  A. Only as a driver.

9  Q. Only as a driver? So does that not

10  give him status as a named insured?

11  A. No.

12  Q. Do you know when Mr. Michael's

13  vehicle was added to the Bad J Trucking

14  policy?

15  A. November the 10th, 2004.

16  Q. And do you have a copy -- well,

17  actually I have here what's called a Status

18  Summary Sheet, and I believe this shows

19  that his vehicle was added on 11/10/2004.

20  Is that correct?

21  A. That is correct.

22  Q. Okay, if you could please, could

23  you tell what kind of vehicle was added and

RICE COURT REPORTING (256) 332-4074

DEPOSITION OF: KAREN EDGE

21

1  read the VIN number into the record please?

2

3      MR. ALLRED: Is that Exhibit 2?

4      MR. STRONG: Yes, that's going to

5  be Defendant's Exhibit 2, the Status

6  Summary Sheet from the Canal policy.

7

8      (WHEREUPON, Defendant's Exhibit 2

9      was marked for identification.)

10

11      A.  It's a 1993 International tractor,

12  VIN number 1MSRACAN3PH465116.

13      Q.  Okay. When Mr. Michael's

14  International tractor was added to the

15  policy, do you know if he was to pay the

16  premiums or if Bad J Trucking was to pay

17  the premiums?

18      A.  He and Bad J Trucking came into my

19  office to add this unit to the policy.

20      Q.  Well, when you say Bad J Trucking,

21  you mean Mr. Barnes?

22      A.  Joey Barnes came into our office to

23  add it to the policy, and Mr. Barnes knew

RICE COURT REPORTING (256) 332-4074

22

1  that he was responsible for paying the

2  premium to our agency, but on this day he

3  had Billy Michael to pay $750 toward the

4  deposit.

5      Q.  And what do you mean by toward the

6  deposit?

7      A.  The deposit to add his truck to the

8  insurance was $1,344, and he paid $750 and

9  was supposed to pay the balance when the

10  endorsement was processed.

11      Q.  Okay, so the total amount for his

12  truck was to be?

13      A.  The deposit premium was to be

14  $1,344, and then he was supposed to pay a

15  monthly premium of $672.

16      Q.  Now, that deposit premium, $1,344,

17  what is that for?

18      A.  That's the amount of deposit that

19  the insurance company requires to place the

20  coverage.

21      Q.  That's not escrow or anything like

22  that?

23      A.  It is an escrow deposit, yes.

RICE COURT REPORTING (256) 332-4074

23

1      Q.  So if an individual does not pay a

2  monthly premium on time, can money be taken

3  out of that escrow account to make up?

4      A.  No.

5      Q.  Okay. Is that money ever touched

6  at any time?

7      A.  The money is only touched if the

8  unit is taken off the policy and the

9  premiums are not paid up-to-date, then that

10  money would be used to pay any unpaid

11  premiums at the time of the termination of

12  the policy.

13      Q.  So if I've got that right, that

14  money is only taken out to pay for premiums

15  that are not paid?

16      A.  Upon cancellation of the policy or

17  upon termination of the vehicle.

18      Q.  And if there's money left in that

19  amount, that would go back to the gentleman

20  or the entity or person that placed that

21  money into escrow?

22      A.  That's correct.

23      Q.  Okay. And I believe you said that

RICE COURT REPORTING (256) 332-4074

24

1  Mr. Michael's premium of the total premium

2  monthly for Bad J Trucking was $502?

3      A.  It was $672.

4      Q.  If we can look again at Defendant's

5  Exhibit 2, it shows a premium, monthly

6  premium of $497.

7      A.  That's for the liability portion of

8  the policy. He also had a $100 per month

9  cargo premium and $75 per month physical

10  damage insurance premium.

11      Q.  So $497 liability, $100 cargo?

12      A.  Yes.

13      Q.  And $50?

14      A.  $75.

15      Q.  And what was that for?

16      A.  That was for physical damage.

17      Q.  And that totals $672?

18      A.  That's correct.

19      Q.  I've got here what I would like to

20  mark as Defendant's Exhibit 4, and it

21  appears to be a Transportation Insurance

22  Services, Inc. receipt number 49980 dated

23  11/10/2004 in the amount of $750 indicating

RICE COURT REPORTING (256) 332-4074

37

1  delinquency, they will not take money out
2  of that account unless the vehicle is
3  terminated from the policy, correct?
4     A.  That's correct.
5     Q.  Mr. Michael was added to the policy
6  on November 10th, 2004, correct?
7     A.  That's correct.
8     Q.  And when was Mr. Michael terminated
9  from the policy?
10    A.  He was terminated from the policy
11  on April the 2nd, 2006.
12    Q.  So he was on the policy for a
13  little less than five months.  Is that
14  correct?
15
16      MR. ALLRED:  She said 2006.
17
18    A.  2005.  I'm sorry.  April the 2nd,
19  2005.
20    Q.  April the 2nd, 2005?
21    A.  Yes.
22    Q.  At the time of Mr. Michael's
23  alleged termination from the policy, how

38

1  much money should he have paid to Canal
2  Insurance either through Transportation
3  Insurance Services or anybody?  Do you know
4  what that total amount of money should have
5  been?
6     A.  No, but I can total it up.
7     Q.  I'll give you the calculator, and
8  if you can, go ahead and total that up.
9     A.  He should have paid $1,354 in
10  escrow.
11    Q.  $1,354?  I thought you said $1,344
12  earlier.
13    A.  Well, we had UM increase.  That was
14  $10 increase, and the $3,836 in premium.
15    Q.  Can you tell me where the $3,836
16  comes from?
17    A.  I can.  It was insurance premium.
18  From November the 10th, 2004 through
19  November the 30th, 2004 was $471.  December
20  1, 2004 through December 31, 2004 was $672.
21  January 1, 2005 through January 31st, 2005
22  $672.  February 1, 2005 through February
23  the 28th, 2005, $672.  March 1, 2005

39

1  through March 31st, 2005, $672, and then he
2  had also been billed April 1, 2005 through
3  April the 30th, 2005, $677.
4     Q.  And that totals $3,836?
5     A.  Yes.
6     Q.  Okay.  Do you know how much
7  Mr. Michael had paid to Transportation
8  Insurance Services on this policy?  Can you
9  add those figures up for us?
10    A.  Yes.  $3,159.
11    Q.  And of that $1,354 was in escrow?
12    A.  That's correct.
13    Q.  And at remainder would have been
14  applied to his premiums, correct?
15    A.  Correct.
16    Q.  So at the time of Mr. Michael's
17  alleged cancellation was he still in
18  arrears with the insurance?
19    A.  Yes.
20    Q.  Okay.  Would he have had enough
21  money in his escrow account to cover what
22  his arreared premiums were?
23    A.  Almost.  He still owed $22.50 after

40

1  his unit was deleted.
2     Q.  And when was his unit deleted?
3     A.  His unit was deleted from the
4  policy on April the 2nd, 2005.
5     Q.  Can you explain to us how
6  Mr. Michael was deleted from the policy?
7     A.  I was told to deleted his unit from
8  the policy by my insured Bad J Trucking,
9  which was Mr. Barnes.  He called me and
10  told me to delete the policy on August the
11  2nd.
12    Q.  Did you just say August the 2nd?
13    A.  I mean April the 2nd of 2005.  I
14  also spoke with Billy Michael on the first,
15  April the 1st, and told him that his unit
16  was being deleted by Mr. Barnes for
17  nonpayment of premium.
18    Q.  If Mr. Barnes were to testify that
19  that conversation never took place, would
20  you disagree with that?
21    A.  I would disagree, yes.
22    Q.  You don't keep copies of phone
23  records that far back, do you?

41

1    A.  I'm sure I could probably find the
2    phone record on it.  I'm sure I have a copy
3    of the phone bill.  I don't know.  If I can
4    find out what number he called from,
5    possibly I could find where I had the
6    conversation with him.
7        Q.  Do you know what phone number he
8    was calling from around that time in your
9    file?
10
11       MR. ALLRED:  Who are we talking
12   about, he?
13       MR. STRONG:  I'm sorry.
14   Mr. Michael.
15       MR. ALLRED:  You asked a little
16   while ago if Mr. Barnes said that
17   conversation never occurred.
18       MR. STRONG:  I'm sorry.  I meant to
19   say Mr. Michael.
20
21       A.  I would disagree with him.
22       Q.  If either Mr. Michael or Mr. Barnes
23   said that?

RICE COURT REPORTING (256) 332-4074

42

1    A.  If either one said it, I would
2    disagree.
3        Q.  Okay.  Do you have a copy of the
4    letter that you sent to, or did you send a
5    copy of a letter to Bad J Trucking
6    confirming that this cancellation was going
7    to take place?
8        A.  He received a copy.
9        Q.  Who's he?
10       A.  Joey Barnes received a copy of the
11   endorsement from the company after it had
12   taken place, after the deletion had taken
13   place.
14       Q.  Do you know when that would have
15   been delivered to Mr. Barnes?
16       A.  It should have been delivered to
17   him around April the 20th of 2005 because
18   that's when we received our copy from the
19   insurance company.
20       Q.  You said April 20th, 2005?
21       A.  Yes.
22       Q.  But Transportation Insurance
23   Services didn't send anything in writing to

RICE COURT REPORTING (256) 332-4074

43

1    Mr. Barnes himself indicating that we're
2    going to make the termination of the
3    Michael vehicle as indicated per a phone
4    call on such and such a day?
5        A.  No, we did not.
6        Q.  Do you do that in standard
7    practice?
8        A.  We do not do that.
9        Q.  So it's your practice to wait for
10   the insured to receive a changed
11   endorsement from the insurance provider, in
12   this instance being Canal?
13       A.  That's correct, before he would get
14   a copy that it was actually deleted.
15       Q.  Do you know if Mr. Barnes sent any
16   written notification to Mr. Michael
17   indicating that he was going to be deleted
18   from the policy?
19       A.  I don't know.
20       Q.  Do you know if Mr. Barnes ever
21   spoke to Mr. Michael about deleting his
22   tractor from the policy?
23       A.  I don't know.  He told me that he

RICE COURT REPORTING (256) 332-4074

44

1    did, but I don't know.
2        Q.  You may have told us, but can you
3    tell us what day, if you're aware, that you
4    spoke with Mr. Barnes regarding the
5    cancellation?
6        A.  I spoke with him on April the 1st,
7    2005.
8        Q.  And that's the same day you say you
9    spoke with Mr. Michael about it?
10       A.  I did, yes.
11       Q.  Did you call Mr. Michael?
12       A.  Mr. Michael called me.
13       Q.  Do you recall what Mr. Michael told
14   you in that conversation?
15       A.  I told him that Joey had asked for
16   his vehicle to be deleted from the policy
17   effective April the 2nd, and he argued with
18   me that he was not past due on his
19   insurance, and I told him that he was past
20   due and that he would still owe Joey Barnes
21   April the 1st premium because his policy
22   was staying on the policy one day in April.
23       Q.  But he wouldn't owe that whole

RICE COURT REPORTING (256) 332-4074

65

1    Q.  On the account card it looks like
2  in red -- we may have to mark these,
3  also and make a copy -- it says deleted '93
4  International in red handwriting on the
5  edge.  Is that correct?
6    A.  That's correct.
7    Q.  And in black ink it says, looks
8  like, return escrow and return premiums.
9  Who would that money have gone to?
10    A.  It would have been applied to this
11  account.
12    Q.  Just the general account for Bad J
13  Trucking?
14    A.  Yes.
15    Q.  Do you know where Mr. Michael's
16  escrow money went?
17    A.  It would have been applied to the
18  account.
19    Q.  Just would have been applied to the
20  account?
21    A.  Yes.
22    Q.  And are these dates showing --
23    A.  These dates are incorrect.

RICE COURT REPORTING (256) 332-4074

66

1    Q.  You're now saying that the dates
2  listed on there --
3    A.  The April 1 was incorrect because
4  the company issued the endorsement deleting
5  his unit April the 1st, and we had asked
6  for April 2nd, so they came back and
7  reversed the April 1st and corrected them
8  to April 2nd.
9    Q.  But still the escrow money was
10  returned?
11    A.  It was, yes.
12    Q.  And it was returned from Canal to
13  Transportation Insurance Services?
14    A.  It was.
15    Q.  And would that have been applied to
16  overdue balances?
17    A.  Yes.
18    Q.  But you don't know exactly whose
19  overdue balance that would have been
20  applied to.  Is that correct?
21    A.  It would have been applied to Bad
22  J's overdue balance, the Bad J account's
23  overdue balance.

RICE COURT REPORTING (256) 332-4074

67

1    Q.  Which would have included anything
2  Mr. Michael may have been in arrears for?
3    A.  It would have, yes.
4    Q.  But also anything Mr. Barnes
5  himself may have been in arrears for.  Is
6  that correct?
7    A.  That's correct.
8    Q.  But there's no way to know whose
9  it's to take care of?  I guess that's what
10  I'm asking.
11    A.  No.
12    Q.  Because as far as Transportation
13  Insurance Services is concerned, an overdue
14  balance is for the trucking company itself,
15  not for the individual trucks listed on the
16  policy.
17    A.  The overdue balance is the
18  responsibility of Bad J Trucking.
19    Q.  And/or Mr. Barnes?
20    A.  And/or Mr. Barnes, yes.
21    Q.  And Mr. Barnes' words to you, as
22  far as you can recall, were that
23  Mr. Michael did not pay him premiums for

RICE COURT REPORTING (256) 332-4074

68

1  the policy?
2    A.  That's correct.
3    Q.  You testified earlier that you're
4  unaware if Mr. Barnes told Mr. Michael that
5  he was being deleted, but did Mr. Barnes
6  ever tell you that he spoke with
7  Mr. Michael about deleting him?
8    A.  He did tell me that he did.
9    Q.  Do you know when he did that?
10    A.  He told me that he spoke with him
11  on April the 1st, 2005.
12    Q.  Did you make a note of that
13  anywhere?
14    A.  Of speaking to Joey Barnes?
15    Q.  Yes.  Any handwritten notes or
16  anything like that?
17    A.  Right here.
18    Q.  You just handed me, looks like, the
19  original of the fax that we have marked as
20  Defendant's Exhibit 9?
21    A.  Yes.
22    Q.  And it has handwritten on there
23  please correct dates of endorsements of

RICE COURT REPORTING (256) 332-407

1                IN THE CIRCUIT COURT

2                        FOR

3            MONTGOMERY COUNTY, ALABAMA

4

5    CANDACE M. GROSE,
     Personal Representative of the
6    Estate of Jakob A. Grose,
     Deceased,
7
            Plaintiff,
8                                        CIVIL ACTION NO.
     Vs.                                 CV-2006-90085
9
     BILLY GENE MICHAEL,
10   BAD J TRUCKING COMPANY,
     et al.,
11
            Defendants.
12

13          * * * * * * * * * * * *

14          DEPOSITION OF JOEY BARNES, taken pursuant

15   to stipulation and agreement before Patricia G.

16   Starkie, Registered Diplomate Reporter, CRR, and

17   Commissioner for the State of Alabama at Large, in

18   the Law Offices of Rushton, Stakely, Johnston &

19   Garrett, 184 Commerce Street, Montgomery, Alabama,

20   on Friday, August 10, 2007, commencing at

21   approximately 12:35 p.m.

22          * * * * * * * * * * * *

23                                       

33

1    A.    Around November.

2    Q.    Of what year?

3    A.    2004.

4    Q.    Okay.  Did you, yourself, hire Billy

5          Michael?

6    A.    Yes.

7    Q.    When you hired Mr. Michael, what was he

8          supposed to do for you?

9    A.    Deliver loads.

10   Q.    Did you know him before you hired him?

11   A.    I heard of him.

12   Q.    What had you heard about him?

13   A.    That he was a pretty good driver.

14   Q.    Who did you hear that from?

15   A.    Other drivers.

16   Q.    Name one of them.

17   A.    Benny Cooksey.

18   Q.    Any others?

19   A.    No.

20   Q.    All right.  When you first got up with

21         Michael, did you contact him or did he

22         contact you?

23   A.    He contacted me.

47

1.  A.  Well, I fired Billy Michael on April 1st.

2   Q.  All right.

3.  A.  Canceled his insurance.

4   Q.  And how does that --

5   A.  I made a load, and I come -- coming back.

6       My cousin and I was going to get this

7       trailer and take it down to Florida.

8.  Q.  Benny Cooksey?

9.  A.  Yes.

10  Q.  Well, how was it that Billy Gene Michael

11      picked it up?

12              MR. WARD:  Form.

13  A.  Don't know.  Don't --

14  Q.  Had he hauled loads for this FSR company

15      before?

16  A.  Prior to April 1st, yes.

17  Q.  Where was the load picked up from?

18  A.  I don't know.

19  Q.  Where were FSR loads usually picked up?

20  A.  From Southern Motion.

21  Q.  Did they have a freight yard there in

22      Pontotoc?

23  A.  Furniture yard.

53

1          under your agreement; is that right?

2    A.    He would not pay his insurance.

3    Q.    Okay.

4    A.    So, I mean, I let him go on April 1st.

5    Q.    All right.  Was that the basis of your

6          dispute, though, that he wouldn't pay you?

7    A.    No, sir.

8    Q.    Was it something else?

9    A.    The basis of the -- of him being fired was

10         that he would not pay his insurance, and

11         they kept on taking out of my insurance and

12         threatening to shut down my insurance

13         because of his negligence of paying.

14   Q.    So he really didn't live up to the

15         agreement that you had with him; is that

16         right?

17   A.    That's right.

18   Q.    Was that agreement in writing?

19   A.    It was verbal.

20   Q.    All right.  Were there any witnesses to

21         your agreement with Billy Michael?

22   A.    No, sir.

23   Q.    All right.  Tell me all the details about

59

1   Q.   Uh-huh (positive response), meaning yes?

2   A.   Yes.  Yes.

3   Q.   And then you see it's got the same

4        International tractor on both of them

5        that's highlighted.  You see that?

6   A.   Yes, sir.

7   Q.   Did you give that information to the

8        insurance agency?

9               MR. WARD:  Form.

10  A.   No.

11  Q.   Well, you would have given it to them on

12       the March 28, '05 to '06 policy, you said,

13       right?

14  A.   They was all the time sending me those

15       forms out, sir.  And they always -- they

16       would lap over.

17  Q.   Do you want to change your testimony that

18       you gave that serial number to them, the

19       March '05 to March '06?

20               MR. WARD:  Form.

21  Q.   That you gave them that number?

22  A.   Sir, I fired that man on April 1st.

23  Q.   I'll ask you about that.

62

1       of clarification, the two

2       documents that you have been

3       referring to, the dec pages,

4       are taken from the traffic

5       accident homicide report,

6       correct?

7    MR. DAVID ALLRED:  That's right.

8    MR. WARD:  Okay.

9    MR. SIMMS:  I was a little

10      confused, and it may help at

11      this point so if I have to ask

12      questions, we don't have to go

13      through all this again.  But I

14      don't recall in my notes if

15      you ever identified who owned

16      the '93 International

17      vehicle.  Does that make sense

18      to you?  I don't think you

19      asked that question.

20   Q.   Who owned the '93 tractor?

21   A.   Billy Michaels.

22   Q.   Did he have title to it?

23   A.   Yes, sir.

63

1    Q.    How do you know that?

2    A.    I guess he did.  I'm saying -- I guess he

3          does.  He was driving it.

4    Q.    Did how it come to be that you could insure

5          a tractor that you didn't hold title?

6    A.    I can insure your house and not hold title

7          to it.

8    Q.    Can you?  Okay.

9          Did you tell -- when you went in to see

10         Karen Edge --

11         Is she the agent?

12   A.    Yes, sir.

13   Q.    And did you tell her what kind of deal you

14         had cut with Billy Michael?

15   A.    That was none of her concern.

16               MR. WARD:  Just answer his

17               question.

18   Q.    Oh, really?  When you went in to see Karen

19         Edge to add --

20   A.    No, I didn't.

21   Q.    Okay.  When you went in to see the

22         insurance agent to add Mr. Michael to your

23         policy, what did you tell her?

64

```
 1    A.    I just told her I wanted to add this
 2          tractor onto my policy.
 3    Q.    All right.  And you gave her the serial
 4          number?
 5    A.    Yes.
 6    Q.    Okay.  You gave her the make and model
 7          number?
 8    A.    Yes.
 9    Q.    Right?
10    A.    Yes.
11    Q.    And you told her who was going to be
12          driving it?
13    A.    Yes.
14    Q.    Was Billy Michael with you?
15    A.    No.
16    Q.    How did they get information from him in
17          order to see if he was a driver that they
18          wanted to insure?
19                   MR. WARD:  Form.
20    A.    He had a prior policy with them.
21    Q.    With Karen Edge?
22    A.    Yes.
23    Q.    All right.  How do you know that?
```

66

1    Q.   Okay.  You recall doing that?

2    A.   Yes.

3    Q.   Then the policy was issued to you.

4         Obviously, you wound up with some

5         declaration pages; is that right?

6    A.   Uh-huh (positive response).

7              MR. WARD:  Yes?

8    A.   Yes, sir.

9    Q.   Was that policy in force at the time that

10        this accident happened on April 7th of

11        2005?

12    A.   No, sir.

13    Q.   How do you know that?

14    A.   I canceled his policy on April 1st.

15    Q.   All right.  Now, describe to me how you can

16        cancel Billy Michael's insurance, liability

17        insurance policy.

18    A.   Just by calling it in.

19    Q.   All right.  Who did you call?

20    A.   Karen Edge.

21    Q.   All right.  And what did you tell her?

22    A.   Wanted him taken off my policy.

23    Q.   Okay.

67

1    A.    That I had fired him.

2    Q.    Did you follow that up with a letter or

3          anything like that?

4    A.    Yes.

5    Q.    You did?

6    A.    Yes.

7    Q.    Okay.  Where is that letter now?  Did you

8          keep a copy?

9    A.    I turned one over to my attorney.

10   Q.    Which attorney?

11   A.    This one.

12   Q.    Robert Ward?

13   A.    Mr. Ward.

14   Q.    Do you know of any reason why he's not

15         produced it to us?

16              MR. WARD:  Yeah, I can tell you

17                   why.  Because I can't find

18                   it.  I can't find a letter of

19                   that nature.

20              MR. DAVID ALLRED:  All right.

21              MR. WARD:  I've looked for it

22                   through my file.

23   Q.    You called Karen Edge April the 1st, right?

68

1    A.    Yes, sir.

2    Q.    And you told her that you had fired Billy

3          Michael; is that correct?

4    A.    Yes, sir.

5    Q.    Did you say anything else to her?

6    A.    Take him off my policy.

7    Q.    And did Ms. Edge say anything?

8    A.    Yes.

9    Q.    What did she say?

10   A.    She said okay.  It will be effective at

11         12:01 tonight.

12   Q.    Okay.

13   A.    Which would have been April 2nd.

14   Q.    And you sent this letter.  When did you

15         send that letter?

16   A.    I sent the letter on April 2nd.

17   Q.    Okay.  You retained a copy?

18   A.    Yes.

19   Q.    Was it ever faxed to Ms. Edge, or you sent

20         it U.S. mail?

21   A.    U.S. mail.

22   Q.    Did you hear anything back from Ms. Edge

23         about the liability insurance coverage

83

1   Q.   Okay. And you don't dispute that -- when

2       you applied for a policy that something

3       happened and you just never, ever received

4       a policy. You don't say that, do you?

5   A.   No, I got the policy.

6   Q.   Okay. Not any dispute about that?

7   A.   No, sir.

8   Q.   Okay. In response to number 11 -- and I

9       asked you something about this a little

10      while ago, but I want to make sure. Your

11      answer to it says that you -- that Michael

12      worked for you from November of '04 through

13      April 1 of '05 under a lease agreement.

14      And that was never put in writing; is that

15      right?

16   A.   I had a form of writing, yes.

17   Q.   Okay. Where is that?

18            THE WITNESS: I also gave you a

19               copy of that also.

20   Q.   Did you give that to Mr. Ward?

21   A.   Yes, sir.

22            MR. WARD: A copy of what?

23   Q.   When did you give it to him?

84

```
 1                    MR. WARD:  Hold on a second.  Do
 2                    you understand what he's
 3                    asking you?  Do you have an
 4                    agreement in writing between
 5                    Mr. Michael and yourself for
 6                    that period at issue?
 7                    MR. DAVID ALLRED:  Wait a minute.
 8                    I don't want you to take the
 9                    question and field it and
10                    massage it and change it.
11   A.   Let me tell you what --
12   Q.   Was there any piece of paper between you
13        and Michael about him running a truck for
14        you?
15   A.   Yes, sir.
16   Q.   Where is it today?
17   A.   I have a copy of it.
18   Q.   Okay.  Did you give a copy to your lawyer?
19   A.   I believe I did.
20   Q.   When did you give it to him?
21   A.   When we had a conference.
22   Q.   Sir?
23   A.   When we had a conference.
```

85

1   Q.   When you had a conference?

2   A.   Yes.

3   Q.   And when was that?

4   A.   Couple months ago.

5   Q.   Were you present in Montgomery when you had

6       that conference?

7   A.   No, sir.

8   Q.   Where did that conference take place?

9   A.   Savannah, Tennessee.

10   Q.   I'm sorry. I just didn't understand what

11       you said.

12   A.   It was in Savannah. I believe it was

13       Savannah, Tennessee, Counce, Tennessee.

14   Q.   You met with Mr. Ward in person?

15   A.   Yes, sir.

16   Q.   What does that agreement say or that paper

17       say?

18   A.   We could never get together, him and I, to

19       sign an agreement. But I give him a piece

20       of paper, and it says on there that by

21       applying my BAD J Trucking to his truck

22       that he agrees to this, what was stated in

23       the letter. And then after receiving that,

86

```
 1        he went to the people that I had my

 2        lettering done by and ordered him a set of

 3        letters.

 4   Q.   Okay.

 5   A.   And the act of applying that to his truck

 6        made him agreeable.

 7   Q.   Okay.  So as far as you were concerned,

 8        y'all had an agreement?

 9   A.   Yes.

10   Q.   Okay.  And it was agreeable with you for

11        him to put BAD J Trucking Company, Iuka,

12        Mississippi on the side of his truck?

13   A.   Yes, sir.

14   Q.   What's the name of that lettering company?

15   A.   I don't recollect right now, but I can get

16        it for you.

17   Q.   How would you get it?

18   A.   When I go home, I can go by there and tell

19        them --

20   Q.   Are they in Iuka?

21   A.   Booneville.

22   Q.   Booneville?  All right.

23   A.   Mr. Stripes is his name.
```

```
 1    Q.    And I know I'm skipping some numbers, but
 2          I've got some other documents marked here
 3          and I'll go back to them.  I'm going to
 4          mark another one 10.
 5                    (Plaintiff's Exhibit 10 was marked
 6                     for identification.)
 7                    MR. SIMMS:  What number is this
 8               one?
 9                    MR. DAVID ALLRED:  9 is the lease
10                    agreement.
11    Q.    So you've got this lease agreement here,
12          Number 9.  How did you come about having
13          that piece of paper today?
14                    MR. DAVID ALLRED:  Y'all have a
15                    copy of it over there?
16                    MR. WARD:  Yeah.  Go ahead.
17    Q.    Did you bring it with you today or is this
18          what you gave your lawyer in Tennessee or
19          what?
20    A.    Yes, that's what I gave my lawyer in
21          Tennessee.
22    Q.    All right.  So this document, Exhibit
23          Number 9, did you type that up?
```

1    A.    Yes, I did.

2    Q.    All right.  And it's dated November 8th of

3          '04.  When did you type it?

4    A.    That was the date that it was typed.

5    Q.    And what did you do with it?

6    A.    I filed it.

7    Q.    Filed it in Mr. Michael's file?

8    A.    No.  I filed one of them in his file and

9          sent the other one to Jerry Stutsey and one

10         to Karen Edge.

11   Q.    Sent one to Jerry Stutsey.  That's at FSR?

12   A.    FSR.

13   Q.    And you sent one to Karen Edge.  That's at

14         Transportation Insurance?

15   A.    Yes, sir.

16   Q.    All right.  Did you send one to anybody

17         else?

18   A.    No, sir.  Well, Billy Michael.

19   Q.    Sir?

20   A.    Billy Michael got one.

21   Q.    Did you send it to him?

22   A.    Yes, sir, by U.S. mail.

23   Q.    Did you send it to the address on this

| | | |
|---|---|---|
| 1 | | letter? |
| 2 | A. | Yes, sir. |
| 3 | Q. | Was it your intention at least on that date |
| 4 | | for him to be leased to you? |
| 5 | A. | No.  I mean -- |
| 6 | Q. | Well, you said on here, you shall consider |
| 7 | | your truck leased to BAD J Trucking. |
| 8 | A. | Oh, yes, sir. |
| 9 | Q. | And you say, I have changed the wording in |
| 10 | | the lease agreement so that a signature is |
| 11 | | not required, but the act of applying the |
| 12 | | decals of BAD J Trucking to your truck, |
| 13 | | paying the required 15 percent, and getting |
| 14 | | your insurance through Transportation |
| 15 | | Insurance, you shall consider your truck |
| 16 | | leased to BAD J Trucking. |
| 17 | A. | That's it. |
| 18 | Q. | That was your opinion at the time that you |
| 19 | | wrote that letter; is that correct? |
| 20 | A. | Yes, sir. |
| 21 | Q. | And this 15 percent, I don't remember |
| 22 | | that -- I thought you said you got $50. |
| 23 | A. | I did. |

112

1    Q.   What's the 15 percent about?

2    A.   That was if he was pulling my trailer.   He

3         never did pull my trailer.

4    Q.   All right.   So if he pulled your trailer,

5         you got 15 percent of the gross freight?

6    A.   Yes.

7    Q.   Did you have any -- you say, I have to

8         change the wording in the lease agreement

9         in that second paragraph.   So what lease

10        agreement are you referring to there?

11   A.   Well, changed the wording of any lease

12        agreement that said -- basically says that

13        he has to sign it.   But since I could not

14        get up with him --

15   Q.   Let me ask you this question.   Was there

16        something called a lease agreement or

17        whatever you want to call it, a piece of

18        paper prior to this November the 8th of '04

19        letter that you were trying to get him to

20        sign, Michael to sign?

21   A.   Yes, there was, but I couldn't never get up

22        with him for him to do so.

23   Q.   Okay.   Where is that document?

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

113

1    A.    I don't know.

2    Q.    Do you have a copy?

3    A.    No, sir.

4    Q.    What did it say?

5    A.    It just said that I, and then blank, you

6          know, and his name, Billy Michael, agreed

7          to the terms of this lease agreement.

8    Q.    Okay.  Do you have a blank one somewhere?

9    A.    No, sir.  I got it from somebody else.  I

10         forget who gave it to me, but it was their

11         lease agreement.

12   Q.    But it was never signed, you say, between

13         you and Michael; is that right --

14   A.    No, sir.

15   Q.    -- okay.  And then this Exhibit 10, it says

16         lease termination.  And it says reason for

17         termination, failure to keep insurance

18         paid.  And that's dated April 1st of '05.

19         Did you type that up?

20   A.    Yes, sir.

21   Q.    What did you do with it?

22   A.    Well, I put it in the envelope and sent it

23         off to him.

131

1              MR. SIMMS:  And that was the end

2                    of your exhibits for today?

3              MR. DAVID ALLRED:  Yes, 11.

4              Right.

5                    EXAMINATION

6    BY MR. SIMMS:

7    Q.   Mr. Barnes, my name is Keri Simms.  I think

8         I've been introduced to you earlier.  I

9         represent Mr. Michael.

10             I just want to be sure.  The vehicle

11        that he was operating at the time of this

12        accident, it was owned by him; is that

13        correct?

14   A.   Yes, sir.

15   Q.   Okay.  And at some point -- and it looks

16        like to me around November of '04 -- you

17        allowed him to put BAD J Trucking's logo on

18        the side of his tractor?

19   A.   Yes, sir.

20   Q.   Okay.  And then I think you testified that

21        you terminated him on April the 1st of '05;

22        is that right?

23   A.   Yes, sir.

1   Q.   Okay.  And you made reference to this in
2        here somewhere, but I didn't see it.  What
3        did you tell him to do as far as the logo
4        on the side of the truck?
5   A.   I sent two individuals over to his house.
6        Since I told him that he is fired away from
7        his house, due to DOT regulations I have to
8        give him 24 hours to reach his home 20,
9        which is his home, and then to remove the
10       logo.  And since he was away from his
11       house, I -- he asked to be -- to go to his
12       house.  So I sent two people over there to
13       remove that logo.  His truck was not at his
14       house.
15  Q.   Okay.  When was that?  Approximately when
16       would that have been done?
17  A.   That would have been done on the 2nd.
18  Q.   April 2nd of '05?
19  A.   Yes.
20  Q.   Okay.
21  A.   They went back on April 3rd.
22  Q.   Okay.  Truck there?
23  A.   Truck was not there.

```
 1   Q.   Okay.
 2   A.   And of course, I had to leave out on a
 3        load, myself, and I wasn't around to keep
 4        them boys going back over there.
 5   Q.   Did you put anything in writing to
 6        Mr. Michael about removing the logo?
 7   A.   No, sir.
 8   Q.   And you say you would have sent him a copy
 9        of the termination; is that correct?
10   A.   Yes, sir.
11   Q.   Did you hand it to him or did you mail it
12        to him?
13   A.   Mailed it to him.
14   Q.   Did you send -- I may have just asked
15        this.  Did you send anything to him in
16        writing about removing the logo?
17   A.   No, sir.
18   Q.   Did you call him and tell him to remove it?
19   A.   I was talking to him.
20   Q.   You told him to remove it?
21   A.   Yes.
22   Q.   And that was prior to this accident?
23   A.   Yes, sir.  That was on April 1st.
```

BAD J TRUCKING
45 county road 229
IUKA, Ms.38852

Billy  Michaels

county road 3011, house #1                    11/8/04
Boonsville,Ms 38829


## LEASE   AGREEMENT

Since it has be

    Since it has become very differcuit to meet with you,
because I deliver loads as you do. to decuss the possibility
of you leasing on your truck to BAD J TRUCKING,


    I have change the wording in the lease agreement,so that
a signature is not required,but the act of appling the decals
of BAD J TRUCKING,to your truck, paying the required 15% and
getting your insurence thur transportation insurence. you shall
consider your truck leased to BAD J TRUCKING.


    1. failure to keep insurence paid SHALL be reason to ter-
minate lease.
    2 failure to keep appointment SHALL be reason to terminate
lease.

3.   upon be terminated,your have 24 hours to surrender decals.


PLAINTIFF'S
EXHIBIT
Barnes  8-10-07

JERY LUM BARNES.
OWNER OF BAD J TRUCKIN

BAD J TRUCKING
45 county road 229
Iuka Ms 38852

BILLY MICHAELS
COUNTY ROAD 3011 HOUSE # 1
BOONVILLE,MS 38829

4/1/05

## LEASED TERMINATION

reason for termination,FAILURE TO KEEP INSURENCE PAID.

JOEY LUM BARNES
OWNER OF BAD J TRUCKING

Copy:  Billy Michaels
       Karen Edge
       TRANSPORTATION INSURE

       C.R.  BROKAGES
       ONTOTOC.MS


PLAINTIFF'S EXHIBIT